**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DATHAN JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-CV-1243 RLW |
| | ) | |
| GENERAL MOTORS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This employment discrimination matter is before the Court on Defendant General Motors, LLC's ("GM") Motion for Summary Judgment.  (ECF No. 95.)  Plaintiff Dathan Jackson ("Plaintiff") opposes the Motion and it is fully briefed.  Because GM has established that no genuine issues of material fact remain as to any of Plaintiff's claims, its Motion for Summary Judgment will be granted in all respects.

**Introduction**

Plaintiff is an African-American male who was employed as an hourly, union employee on the assembly line at GM's Assembly Plant in Wentzville, Missouri from January 12, 2015, through June 28, 2018.  Plaintiff sustained a back injury at work on June 28, 2016.  Thereafter, Plaintiff's work restrictions imposed by his doctor left him unable to work his usual position.  Plaintiff had periods of paid and unpaid leave and attempted to work in multiple other positions to which GM reassigned him, but those positions either hurt his back or were not available to Plaintiff on a permanent basis.  GM terminated Plaintiff's employment on June 28, 2018, for the stated reason that he violated the terms of its collectively bargained, mandatory six-step attendance policy.

Plaintiff filed this action claiming that GM terminated him for discriminatory reasons.  Plaintiff's Second Amended Complaint (ECF No. 31) ("Complaint") asserts federal and

supplemental state law claims of disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA") (Count I), and the Missouri Human Rights Act, §§ 213.010, et seq., Mo. Rev. Stat. (2017) ("MHRA") (Count III); retaliation in violation of the ADA (Count II) and MHRA (Count IV); discrimination based on Plaintiff's exercise of rights under the Missouri Worker's Compensation Law, § 287.780, Mo. Rev. Stat. ("MWCL") (Count V); and race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII") (Count VI), and the MHRA (Count VII).[1]  GM moves for summary judgment on all of Plaintiff's claims.

**Legal Standard**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  The substantive law determines which facts are critical and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Id.  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); Anderson,

---

[1]Plaintiff voluntarily dismissed without prejudice Count VIII of his Complaint, which asserted a state law tortious interference with contract claim against former defendant Dr. Anil Gupta.  (ECF No. 58.)

2

477 U.S. at 248.  "The nonmoving party may not rely on allegations or denials," but rather "must substantiate [his] allegations with sufficient probative evidence that would permit a finding in [his] favor on more than mere speculation or conjecture."  Carter v. Pulaski Cnty. Special Sch. Dist., 956 F.3d 1055, 1059 (8th Cir. 2020) (quoting Ball v. City of Lincoln, Neb., 870 F.3d 722, 727 (8th Cir. 2017) (cleaned up)).  "Small factual disputes about the underlying events . . . could only create the 'metaphysical' kind of doubt that the Supreme Court decried in Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)."  Main v. Ozark Health, Inc., 959 F.3d 319, 327 (8th Cir. 2020) (cleaned up; quoted case omitted).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor.  Celotex Corp., 477 U.S. at 331.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

**Facts**

## I.

As a threshold matter, GM filed a Statement of Undisputed Facts (ECF No. 97) in support of its Motion for Summary Judgment as required by Local Rule 4.01(E), consisting of 246 separately numbered paragraphs in 47 pages.  Plaintiff filed a Response (ECF No. 107) as required by Rule 4.01(E), which denied many of GM's facts and consisted of 57 pages.  GM filed a Motion to Strike and Deem Responses to Statement of Undisputed Facts Admitted (ECF No. 124), which asserted that Plaintiff's Response violated Rule 56, Federal Rules of Civil Procedure, and Local Rule 4.01(E), as to—

• inadmissible exhibits d, h, i, l, m, n, o, and r/s , which lack foundation and authentication;

• Roy Weatherspoon's Declaration, a previously undisclosed witness, whose testimony lacks probative value and unduly confuses the issues;

• Plaintiff's Declaration, which contains self-serving testimony, hearsay, and contradicts his deposition;

• Plaintiff's Responses to Facts 13, 15, 18, 25 (FN 6), 32-33, 35-37, 39-44, 47-48, 53, 58, 64-65, 70, 84, 87-89, 94-95, 100, 106, 114, 117, 120, 125, 127, 129-132, 135 (FN 10), 146-148, 150, 152, 154-155, 157, 160, 161, 165, 168-169, 171-172, 174-175, 177, 191-192, 195-198, 200, 202, 205-207, 217, 220, 225, 232, 237-238, 242-244, to the extent they add non-responsive, self-serving statements that are unrelated to the original factual assertion.

• Plaintiff's responses to Facts 5-8, 10-12, 20-21, 28, 35, 60 (FN 16)-61, 64, 67, 76-77, 80, 82-83, 86, 110 (FN 24), 112, 115, 117, 122, 123, 141, 155, 158, 168, 177, 178, 190, 207, as unsubstantiated denials inconsistent with Local Rule 7-401 and Fed. R. Civ. P. 56.

• Plaintiff's Responses to Facts 69, 71-74, 114 and footnote 16 because they rely on Plaintiff's inability to recall the event described in the original Fact.

(ECF No. 124 at 1-2.)

The Court denied GM's Motion to Strike on the grounds that a motion to strike is properly directed only to pleadings, Rule 12(f), Fed. R. Civ. P., and when ruling on a motion for summary judgment a Court should ignore inadmissible evidence instead of striking it from the record.  (ECF No. 130.)

GM filed a Reply in Support of Statement of Undisputed Facts (ECF No. 127), a 149-page document that sets forth each of GM's Facts, Plaintiff's Responses, and argument as to why the Court should not credit the denials or the additional, allegedly non-responsive, information contained in Plaintiff's Response.  Thus, the Court has been presented with a total of 255 pages of facts, disputes, and argument with respect to the facts.

The "concision and specificity required" by rules such as Local Rule 4.01(E) "seek to aid the district court in passing upon a motion for summary judgment, reflecting the aphorism that it is the parties who know the case better than the judge." Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) (cited case omitted). The local rule "exists to prevent a district court from engaging in the proverbial search for a needle in the haystack. Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." Id. (internal quotation and citation omitted).

Here, the parties have eluded Local Rule 4.01(E)'s requirements of concision and specificity and forced the Court to undertake a cumbersome review of the record. Plaintiff disputes many of GM's Statement of Undisputed Facts, often by lengthy explanations and arguments, some of which are non-responsive, and many of which add extraneous information that appears intended to obscure and confuse rather than clarify the record. The Court disregards these where they do not raise genuine disputes of material fact, but does not specifically address each one. Plaintiff often refers to his verified Declaration (ECF No. 109, Ex. 9), but some of the averments therein contradict Plaintiff's prior deposition testimony, are not supported by citations to record evidence, or reflect Plaintiff's frequent testimony that he does not remember events documented in GM's employment records.[2] Where Plaintiff establishes a genuine dispute as to a material issue of fact

---

[2]After Plaintiff's deposition was taken, GM served Plaintiff with extensive Requests for Admissions (ECF No. 101, Ex. 22). For his answers to many of the Requests, Plaintiff denies or states he is unable to admit or deny information contained in GM's records, such as his absence from work on particular dates, including for disciplinary suspension, or states he is "unable to admit or deny [a Request] because he does not recall many of the exact dates that he did and did not work at GM, including these dates, although he has a distinct recollection of certain dates. Plaintiff currently has no evidence to show that he worked these dates." See, e.g., Pl.'s Answers Nos. 12, 13, 19, 20, 24, 25, 26, 27, 33. Plaintiff similarly denies other events documented in GM's records without offering affirmative evidence to support his denials. See, e.g., Pl.'s Answers Nos. 14, 15, 16, 17, 18, 28, 29, 30, 32. These citations are merely illustrative of many similar Answers by Plaintiff.

or that a justifiable inference may be drawn in his favor, the Court accepts Plaintiff's version of events as true.

## II.

The Parties

GM operates an Assembly Plant in Wentzville, Missouri where it produces trucks and vans. Plaintiff was employed as an assembler at the Assembly Plant from January 12, 2015, through June 28, 2018.  Plaintiff was hired as a temporary employee.  On March 12, 2015, he accepted a position for regular, full-time employment.  Plaintiff worked in General Assembly which includes the Trim and Chassis departments.  He originally worked the third or midnight shift until he bid on and received a first shift position.  Generally, the first shift consists of more senior employees than the second or third shift, because it is a better work schedule.

The Collective Bargaining Agreement

At all times during Plaintiff's employment with GM, a National collective bargaining agreement ("National CBA") between GM and the Local 2250 United Autoworkers Union (the "UAW" or "Local 2250") and a Local collective bargaining agreement ("Local CBA") between GM and the UAW governed Plaintiff's employment.  Plaintiff was a member of UAW Local 2250 and was paid on an hourly basis while a GM employee.  The current composition of the Local 2250 bargaining unit is approximately 50% Black.

The National CBA contains "Document No. 8 – Memorandum of Understanding – Special Procedure for Attendance" ("Document 8") (ECF No. 98-4).  Document 8 states it is "is a process in which the reason for an absence is no longer relevant nor required."  (Doc. 8 ¶ 2.)  Document 8's "procedure is separate and distinct from the plant's standard corrective disciplinary procedures. All instances of employee absence, except the excludable absences as defined in paragraph 5, below, will be addressed through this procedure."  (Doc. 8 ¶ 4.)  Paragraph 5 of Document 8

provides the specific circumstances under which employee absences are excused, and includes the following types of excused/approved leave relevant here: informal leave, formal leave, sick leave (when receiving Sickness and Accident Benefits), compensable leave, approved vacation, vacation restricted ("VR"), disciplinary layoff or suspension.[3]  Absences that are not excused under the terms of Document 8 are considered "unexcused" and are subject to a six-step progressive disciplinary process outlined as a part of Document 8, which culminates in the termination of the employee's employment at Step 6.  (Doc. 8 ¶ 10.)

Document 8 provides that absences of three or more consecutive days will be treated as two separate absences, which means an absence of four consecutive days amounts to two of the six steps of the discipline process.  (Doc. 8 ¶ 6.)  Each of the first five Attendance Improvement Steps of the progressive discipline under Document 8 remain on an employee's record for specified periods of time.  (Doc. 8 ¶ 10 chart).  For example, a Step 1 discipline remains on an employee's record for six months and any subsequent discipline within six months of a Step 1 discipline would progress the employee to the next step(s).  (Id.)  If an employee received no further attendance discipline while the Attendance Improvement Step 1 discipline was in effect, the Step 1 discipline would roll off of the employee's record at the end of six months.  Attendance Improvement Steps 3, 4, and 5 of Document 8's six-step progressive discipline process remain on an employee's record for eighteen months.  (Id.)  Steps 1 through 5 are "extended by periods of leaves."  (Id.)  This means that the time the Document 8 discipline remains on an employee's record is paused while

---

[3]Vacation Restricted ("VR") is paid time off allotted to each union employee pursuant to the collective bargaining agreement.  UAW employees receive 5 VR days (40 hours) each year.  VR time may be used in increments of hours or days and may be used for any reason whatsoever, with 30 minutes notice prior to the employee's shift.  Pursuant to Document 8 (¶ 8), however, employees who are placed in Step 4 or Step 5 of the Attendance Improvement Steps must receive prior approval for use of VR days.  (Herina Decl. #2 ¶ 9 (ECF No. 129-1)).  Document 8 also addresses a variety of other excused absences not at issue in this case.

the employee is on any form of leave.  For example, if an employee is on leave for two months of a twelve-month discipline period, the discipline stays on his record for fourteen months.

Because Document 8's terms and application are stringent, GM routinely disciplines employees under the policy.  There were over 6,000 incidents when employees received Document 8 discipline between January 1, 2015 and July 29, 2019.  During this period, two of GM's UAW ADAPT Representatives Ron Brown and Shara Houlihan-Grabenhorst ("Houlihan"), whose conduct is at issue in this case, also received discipline under Document 8 for unexcused absences.

Because Document 8 is "separate and distinct from the plant's standard corrective disciplinary procedures," the Attendance Improvement Steps outlined in Document 8 are not subject to ¶76(b) of the National CBA, which states that "imposing discipline on a current charge, Management will not take into account any prior infractions which occurred more than twenty-four months previously."   (Herina Decl. #2 ¶ 10.)   GM has imposed discipline, including termination, for Document 8 events that occurred more than twenty-four months earlier.  (Id.) "Document 8 discipline remains on an employee's record for the time prescribed and shall remain on the employee's record until he/she was actively working in the Plant (as opposed to on leave) for the time period of the discipline."  (Id.)

Plaintiff understood that under Document 8's special procedure for attendance under the National CBA, there were fixed outcomes for all attendance issues.

The National CBA contains a seniority provision that applies to all regular UAW employees employed by GM.  Plaintiff understood that under the National CBA, all positions at GJ are assigned based on seniority.  Under the union seniority rules at GM, employees can bid on open jobs.  If two employees bid on the same job, the employee with the higher seniority gets the job.  This rule applies even when the employee with lower seniority has a medical condition or disability limiting his or her ability to perform the essential functions of their former position; a

lower seniority employee cannot bump an employee with higher seniority from a job, even if the lower seniority employee's placement is due to an illness or disability that requires accommodation.[4]  Plaintiff did not accrue seniority while he was a temporary employee and his seniority date with GM was March 12, 2015.

GM's Policies and Procedures

At all times during Plaintiff's employment, GM had in place policies that are designed to prevent discrimination, harassment, and retaliation against employees on the basis of protected categories including disability and race.  GM employs Denise Black, a Black female, in the role of Discrimination Coordinator to take complaints of harassment and discrimination against GM made by members of UAW Local 2250.  In her role as Discrimination Coordinator, Ms. Black speaks to new hires at their orientation and provides new employees the means by which she can be contacted in the Labor Relations Department.[5]

Plaintiff did not complain internally at GM about being treated differently based on his medical condition, disability, or race.  (Pl. Dep. 544:23-545:3.)[6]  Plaintiff did complain to GM that he had not been paid for two days that he had worked in July 2017, and one day that he had worked in October 2017.

---

[4]Paragraph 72 of the National CBA provides, "Employees who have been incapacitated at their regular work by injury or compensable occupational disease while employed by the Corporation, will be employed in other work on jobs that are operating in the plant which they can do without regard to any seniority provisions of this Agreement, except that such employees may not displace employees with longer seniority, provided, however, that by written agreement between local Management and Ship Committee, such employees may be placed or retained on jobs they can do without regard to seniority rules." (Emphasis added.)  The uncontroverted evidence is that there was no written local agreement permitting employees who had been injured at work to be placed on jobs without regard to seniority, and all positions at GM's Wentzville Assembly Plan are placed according to seniority.  (Welling Dep. 11:10-20; Houlihan Dep. 46:22–47:10; Renaud Dep. 124:19-22; Herina Decl. ¶ 13.)

[5]Plaintiff denies that Ms. Black spoke at his orientation.  This dispute is immaterial.

[6]As will be discussed later, Plaintiff also complained about positions he was assigned to following his back injury, as GM attempted to accommodate his physician's work restriction.

GM Plant Medical Department

GM maintains a medical department at the GM Assembly Plant and staffs it with onsite physicians and nurses to address work-related and non-work related injuries, disabilities, and illnesses ("GM Plant Medical").  GM Plant Medical employs nurses who are members of the local UAW union.  Nurses are non-exempt employees at GM, except for one nursing supervisor.  Nurses in GM Plant Medical do not make employment decisions such as hiring, termination, or discipline related to UAW employees in the Wentzville Assembly Plant.

GM Plant Medical maintains medical records and progress notes for all employees seen in GM Plant Medical, including Plaintiff.  If an employee has a work-related injury that is covered by workers' compensation, GM Plant Medical typically serves as the primary medical care provider and makes decisions related to the course of treatment, including the need for additional testing, physical therapy, or other outside services to facilitate the employee's recovery.  For non-work related injuries and those not covered by workers' compensation, GM Plant Medical serves only as an advisor/evaluator, and does not serve as the primary medical care provider.[7]

All employees returning from a medically related leave of absence are required to undergo a return to work evaluation by GM Plant Medical prior to returning to work.  This policy applies equally to all employees whether their leave is covered by workers' compensation or not.  Pursuant to GM's policy, which Plaintiff understood at the time, restrictions or leave prescribed by a personal physician must contain an end date for the listed restrictions or leave.[8]  (Pl. Dep. 223:9-

---

[7]GM Plant Medical records note whether an employee's workers' compensation claim is approved or denied to indicate whether GM Plant Medical is serving as the primary medical care provider.  GM Plant Medical plays no role in deciding whether workers' compensation benefits are approved or denied; those decisions are made by GM's third-party benefits administrator, Sedgwick.

[8]Plaintiff disputed this fact by stating there is no written policy requiring end dates on physician's notes.  In his deposition, Plaintiff admits that he was aware of the policy requiring an end date on work restrictions and that GM Plant Medical repeatedly told him his physician's note needed an end date so there

225:1; Gupta Decl.  ¶15.)  A new doctor's note, with end dates for the restrictions, is required to either extend the leave or return the employee to work.  Otherwise, the leave is unexcused and subject to discipline under Document 8.

GM Plant Medical has the limited discretion to temporarily cover certain employee absences that are associated with medical care and treatment of employees.  (Herina Decl. #2 ¶ 11.)  Absences that Plant Medical can cover are excused under Document 8.  (Id.)  Those instances are limited to situations where the absence is necessitated by Plant Medical's need for additional information, or the employee's need for medical treatment that is requested by GM Plant Medical; e.g., Plant Medical requests an employee return to his personal physician to provide updated restrictions, which occurred in this case when Plaintiff reported back pain from an assigned position.  (Id.)  Such "covered" absences would be excused under the terms of Document 8 under sick leave.  (Id.)

At the conclusion of the return to work evaluation by GM Plant Medical, the employee is given a Duty Disposition Report ("DDR"), subsequently called a Duty Disposition Letter ("DDL"), which includes the following information: (1) the date and time of the visit to GM Plant Medical; (2) a list of the employee's restrictions; (3) the start date and end date for the restrictions; and (4) any notes related to employment status and the date of next appointment with GM Plant Medical.  During Plaintiff's employment with GM he was issued a DDR on thirty-two (32) occasions.

---

was a specific date when his work restrictions would be re-evaluated.  To the extent Plaintiff asserts that GM occasionally accepted notes without an end date, the record shows he was reminded each time to comply with the requirement in the future.  GM Plant Medical's relaxation of its rules in Plaintiff's favor is not evidence of a disputed fact as to discrimination, retaliation, or pretext.  See Sandbach v. Rafco Clean, LLC, 2020 WL 109591, at *5 (E.D. Mo. Jan. 9, 2020) (it was not evidence of pretext where defendant disregarded its progressive discipline procedure to the extent it did not enforce a three-day suspension against plaintiff after she received a third warning under the procedure, as this was "doing something positive" for the plaintiff).

GM's ADAPT Program

At all relevant times, GM has had a program called "Accommodating DisAbled People in Transition," known as ADAPT.   ADAPT allows "UAW-GM employees with restrictions or disabilities an opportunity to be either retained at work or return to work on meaningful jobs." Participation in the ADAPT program is voluntary at the employee's election.   During Plaintiff's employment, GM employed Ron Brown and Shara Houlihan as the ADAPT UAW Representatives.   Their primary job function was to place ADAPT participants in open positions that met the employees' restrictions.   Brown and Houlihan were appointed to their positions by the International UAW, specifically the Vice President and Director of the UAW-General Motors. (Herina Decl. #2 ¶ 4.)

GM provides to UAW ADAPT representatives an ADAPT Manual (ECF No. 108-2) that is intended as a guide for the ADAPT process that is administered and applied on the Plant level. The procedures set forth in ADAPT Manual are not mandatory.   ADAPT procedures are administered on a plant-by-plant basis and may vary from the guidelines set forth in ADAPT Manual depending on the specific needs of the individual Plant.   (Herina Decl. #2 ¶ 14.)

ADAPT participants who are being treated by a personal physician engage in the following process to return to work:  (1) visit GM Plant Medical with restrictions from their personal doctor; (2) GM Plant Medical reviews the restrictions in relation to the particular employee's duties at GM and determines whether the restrictions are appropriate under the medical circumstances;[9] (3) GM Plant Medical implements the employee's personal physician's restrictions; and (4) the employee presents the restrictions to ADAPT or Labor to see if any available jobs fit the restrictions.

---

[9] GM Plant Medical never made modifications to Plaintiff's work restrictions.  On the day Plaintiff was terminated, his work restrictions were modified by his personal physician, Dr. Shenouda, after GM Plant Medical Director Dr. Gupta called Dr. Shenouda to clarify and discuss Plaintiff's restrictions.  This is discussed more fully *infra*.

GM Plant Medical personnel do not decide whether to place an employee in a particular position or if any positions are open; those decisions are left to ADAPT and Labor.  After an employee presents restrictions to ADAPT or Labor, ADAPT representatives and/or GM Labor Relations Representatives assess the restrictions and determine whether any open jobs are available within the restrictions.

ADAPT places employees in positions according to their restrictions and seniority under the National CBA.[10]  ADAPT employees cannot bump more senior employees from their position as an accommodation to a disability.  When trying to place employees in positions that meet their restrictions, ADAPT representatives first look at open and available positions within the employee's home department on their assigned shift.  If no jobs are available in the employee's home department on their assigned shift, then the ADAPT representative will look at jobs within the same department on other shifts.  ADAPT does not place employees outside of their home department.  In this case, the ADAPT representatives placed Plaintiff in jobs located only in the General Assembly department.

ADAPT representatives determine open/available positions in several ways, including, as appropriate, by talking to the UAW committeemen (UAW-appointed representatives who serve as intermediaries between GM management and union employees), by talking to department business managers about openings with their respective departments, and/or by reviewing 603 sheets and

---

[10] Plaintiff denies this fact and asserts he was placed in numerous positions that caused him pain and were not consistent with the work restrictions issued by his personal physician and implemented by GM Plant Medical.  Plaintiff's subjective opinion that the jobs in which he was placed did not meet his work restrictions *because they caused him pain* is not supported by any evidence in the record, including competent medical testimony, and does not create a genuine dispute of material fact, particularly as Plaintiff admitted he did not know the job duties of his placements as he did not read the Job Element Sheets ("JES"). (Pl. Dep. 287:7-289:15.)  The undisputed evidence in the record is that GM *believed* the jobs on which it placed Plaintiff met his restrictions.  Further, it is undisputed that when Plaintiff complained a job hurt his back, he was sent to ADAPT or Plant Medical (which then covered his absences), and was removed from that job.

63(b) sheets.  A 603 Sheet is a list of employees who are on sick leave as of the particular date that the 603 sheet is printed.  ADAPT participants can be placed on a temporary basis in positions that are temporarily open due to the permanent employee being on sick leave.  63(b) sheets are posted within a department and show all open positions within the department that are open for bid.  Open positions on the 63(b) list are awarded based on seniority.[11]

To determine if a particular job fits an employee's restrictions, an ADAPT representative relies on several resources as appropriate and necessary to the particular situation, including: (1) personal experience, (2) talking to the UAW committeeperson and department business managers, (3) reviewing the Job Element Sheets ("JES") detailing the physical requirements of a particular position, (4) observing other employees performing the job; and/or (5) consulting with GM Plant Medical.  ADAPT Representative Shara Houlihan testified she particularly considered the employee's height for some jobs.  (Houlihan Dep. 115:9-21).  Plaintiff is 6' 5" tall.

When GM is unable to find a job that accommodates one or more of an employee's restrictions, it places the employee on "No Jobs Available With Restrictions" ("NJAWR") status.  For all employees on NJAWR status, each must return to GM Plant Medical upon the expiration of NJAWR leave.  Plaintiff acknowledged in his deposition that he was required to physically return to GM Plant Medical for appointments that corresponded to the dates his NJAWR status ended.  (Pl. Dep. 273:17-274:24.)

Paragraph 43(b) of the National CBA allows employees to file a grievance based on "a refusal of Management to return an employee to work from sick leave of absence by reason of the

---

[11]The GM Assembly Plant does not retain as part of its business records copies of bid sheets, 63(b) sheets, and 603 sheets in the ordinary course of its business because doing so would require retention of large volumes of documents.  Nothing in GM's document retention policies or within the UAW collective bargaining agreement requires retention of these documents.  (Herina Decl. #2 ¶ 13.)

medical findings of a physician or physicians acting for the Corporation."  Plaintiff never filed a grievance under Paragraph 43(b) of the National CBA.

Plaintiff's Attendance and Document 8 Disciplinary History at GM

From January 1, 2016, to June 28, 2018, during the last two and a half years of Plaintiff's employment, GM's records reflect and it believes that Plaintiff worked a total of 440.5 hours, or approximately fifty-five (55) eight-hour days, out of 913 days.  From January 1, 2016, to the date of his termination on June 28, 2018, GM's records reflect and it believes that Plaintiff never worked a complete forty-hour workweek.  During Plaintiff's employment from January 2015 to June 28, 2018, GM's records reflect that he did not work on 846 days for various reasons that include, among other things, days Plaintiff was on NJAWR leave and on unrelated disciplinary suspension.  The Court incorporates by reference herein the chart set forth in GM's Statement of Facts No. 60 (ECF No. 127 at 32-35) that shows the days Plaintiff did not work and the evidentiary support in the record therefor.

Plaintiff was absent from work from December 2-10, 2015, and as a result received discipline pursuant to Document 8 of the UAW National Agreement.[12]  Plaintiff provided no medical documentation to GM that excused his absences on December 2-8, 2015, though he presented a note on December 11, 2015, that was dated December 8, 2015 and excused him from

_____

[12]Plaintiff's denial of this fact is contrary to the record evidence including GM's business records and is not supported by admissible evidence, but rather takes issue with whether the discipline was justified. Plaintiff does not present probative evidence to overcome GM's evidence but instead points to self-serving and otherwise unsupported references in his deposition testimony.  "The nonmoving party may not rely on allegations or denials," but rather "must substantiate [his] allegations with sufficient probative evidence that would permit a finding in [his] favor on more than mere speculation or conjecture."  Carter, 956 F.3d at 1059 (quoted case omitted).  See Bacon v. Hennepin Cnty. Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008) (self-serving affidavits cannot defeat a properly supported summary judgment motion but a plaintiff must substantiate his allegations with probative evidence which would permit a finding in plaintiff's favor); Nicks v. Wilkie, 2020 WL 836313, at *4 (E.D. Mo. Feb. 20, 2020) (no genuine issue of material fact existed where plaintiff did not present probative evidence to overcome the defendant's evidence but instead pointed to self-serving and otherwise unsubstantiated references in her deposition testimony).  Plaintiff's self-serving and otherwise unsupported testimony here does not raise a genuine dispute of fact.

work only on December 10, 2015.  Thus, these absences were unapproved absences under Document 8, which mandates imposing discipline for any absences not excused by its policy.

On March 16, 2016, after allowing Plaintiff time to appeal the denial of a short-term disability ("STD") claim related to the December 2015 absences, GM issued Plaintiff a "Notice of Disciplinary Action–Inappropriate Behavior" for Attendance Improvement Step 2 under Document 8 of the National CBA, progressing to Step 2 because the absence totaled more than three consecutive days.  Plaintiff received a copy of the Step 2 Discipline on or about March 16, 2016, but refused to sign it because he did not agree with it.

The gap in time between Plaintiff's absences and GM imposing the Step 2 discipline occurred in part because GM's policy is to issue all employee discipline in person.  GM does not issue discipline or discuss disciplinary matters by phone or e-mail communication.  In Plaintiff's case, GM waited until Plaintiff returned to work and addressed his disciplinary issues in person at that time.  The gap in time also occurred in part because the Assembly Plant was shut down between December 24, 2015, through January 16, 2016, and Plaintiff was absent from February 1-12, 2016, and March 2-9, 2016.

GM's records reflect and it believes that on March 16, 2016, Plaintiff was present for a 76(a) Discipline Interview with Jeff Morgan, UAW Committeeman, and Angela Harper, Labor Relations Representative. [13]  GM has no record of Plaintiff filing a grievance after he received Step 2 of the Document 8 disciplinary process.  The UAW did not independently file a grievance regarding this discipline. [14]

---

[13]The reference to a "76(a) Discipline Interview" relates to Paragraph 76(a) of the National CBA.

[14]Grievances may be filed for Document 8 discipline when the procedure was improperly administered (e.g., the wrong step of the process), or if there are extraordinary circumstances beyond the employee's control.  (Herina Decl. ¶ 36 (ECF 101-4)).

GM's records establish that Plaintiff was absent from February 1, 2016 through February 12, 2016.[15]  Plaintiff denies the absence but admits he has no evidence to show he worked these dates.  As a result, on March 16, 2016, GM issued Plaintiff a "Notice of Disciplinary Action – Inappropriate Behavior" for Attendance Improvement Step 4 under Document 8, issued during the same 76(a) Discipline Interview with Jeff Morgan and Angela Harper where GM presented Plaintiff's Step 2 discipline.

Plaintiff understands that he went from Step 2 of Discipline to Step 4 of Discipline because the absences from February 1–12, 2016, were more than three consecutive days and counted as two separate Steps.  As a result of Plaintiff reaching Step 4 in the Document 8 Disciplinary Process, GM suspended Plaintiff from work without pay for the balance of his shift on March 16, 2016, plus two weeks thereafter.[16]  GM has no record of Plaintiff filing a grievance after he received Step 4 of the Document 8 disciplinary process.  The UAW did not independently file a grievance regarding this discipline.

GM's records reflect and it believes that Plaintiff missed work on May 24, 2016, and May 25, 2016, so he again received discipline pursuant to Document 8 of the National CBA.  Plaintiff was not paid for working this time, he has never complained that he was not paid for time he worked from May 24–25, 2016, his time records do not indicate he clocked in, and he did not file a grievance relating to either the unpaid time or the discipline.  On May 26, 2016, GM's records reflect that GM issued Plaintiff a "Notice of Disciplinary Action–Inappropriate Behavior" for

_____

[15]Plaintiff's response to GM's statement of this fact is that he "does not recall being absent or receiving this disciplinary notice."  Plaintiff's failure to recall an event is not the same as a denial supported by admissible evidence in the record.  See Bosley v. Cargill Meat Solutions Corp., 705 F.3d 777, 782 (8th Cir. 2013); see also To v. U.S. Bancorp, 651 F.3d 888, 892 (8th Cir. 2011) (recognizing that failing to recall whether an event occurred is not the same as denying the event occurred).

[16]Plaintiff testified he does not recall receiving a suspension in 2016.  Plaintiff's failure to recall an event is not the same as a denial supported by admissible evidence in the record.  See n.15, *supra*.

Attendance Improvement Step 5 under Document 8 during a 76(a) Discipline Interview with Bobby Harris and Jeremy Stritzel.  The UAW did not independently file a grievance regarding this discipline.[17]

As a result of Plaintiff reaching Step 5 in the Document 8 Disciplinary Process, GM suspended Plaintiff from work without pay for the balance of his shift on May 26, 2016, plus thirty days thereafter.  Plaintiff testified that he had no recollection of being suspended for thirty days from May 26, 2016, through June 26, 2016, or being suspended for the balance of shift plus two weeks for Step 4 of the disciplinary process.[18]  GM does not retain records of "badge swipes" that would show if Plaintiff was at the plant on the dates of the alleged suspension.

It is undisputed that Plaintiff was not paid for any hours during either suspension, his time records do not indicate he clocked in during either suspension, and he did not file a grievance relating to either the unpaid time or the discipline.  Plaintiff admits GM has no record of him working on May 24-25, 2016, coded him "U" for unexcused, and issued him Step 5 Discipline in relation to missing work on May 24–25, 2016.  The evidence of record is wholly consistent with Plaintiff being absent and the unavailability of badge swipes is immaterial because: (1) GM Ex. 16/Ex. MM reflects that on May 26, 2016, Plaintiff attended a disciplinary meeting at 5:00 a.m. at which he was assessed Step 5 Discipline that included an unpaid suspension for the balance of his shift (BOS) on May 26, 2016, plus 30 days thereafter; (2) GM Ex. 9 establishes that Plaintiff worked a partial shift on May 26, 2016 (clock-in at 21:59/clock out at 05:00), which is consistent with the timing of the disciplinary meeting that began at 5:00 a.m. on May 26, 2016; and (3) GM's

---

[17]Plaintiff admits that GM's records reflect the absences, but denies the absences and denies receiving Document 8 discipline for the absence.  Plaintiff's self-serving and otherwise unsupported testimony here does not raise a genuine dispute of fact.  See Bacon, 550 F.3d at 716.

[18]Plaintiff's failure to recall an event is not the same as a denial supported by admissible evidence in the record.  See n.15, supra.

attendance records show that Plaintiff was absent and coded "D" (for Discipline) for May 27, 2016, to June 26, 2016, and his first day back to work was Tuesday, June 27, 2016, the day before his back injury on June 28, 2016.  (See GM Ex. 9.)  Plaintiff therefore does not raise a genuine dispute of fact as to the imposition of Step 5 discipline and a thirty-day suspension from May 27, 2016, through June 26, 2016.[19]

Based on GM's record of Plaintiff's unexcused absences on December 2–10, 2015, February 1–12, 2016, and May 24–25, 2016, GM believed Plaintiff was at Step 5 of the Document 8 disciplinary process as of May 26, 2016.

Plaintiff was absent from work on January 16, 2018, and received discipline pursuant to Document 8 of the UAW National CBA.  That day, January 16, 2018, was the first date of a series of unexcused absences that Plaintiff incurred in January and February 2018.  Because Plaintiff was on the final step of the Document 8 disciplinary process, only a single unexcused absence was necessary to warrant moving to Step 6 for termination, so GM's stated basis for Plaintiff's termination was the first unexcused absence he incurred.

On January 31, 2018, the GM Personnel Department sent Plaintiff a letter by certified mail, return receipt requested, that stated:

> In accordance with Paragraph (64d) of the GM-UAW National Agreement, you are hereby instructed to report for work. Failure to report for work in accordance with this notice within five (5) working days after delivery or attempted delivery of this notice, whichever comes first, may result in the loss of your seniority.

(GM Ex. WWWW, ECF No. 99-26 at 1.)

---

[19]Moreover, any dispute would also be immaterial because Attendance Improvement Steps 1 through 5 of Plaintiff's discipline under Document 8 occurred before Plaintiff's disability and there is no allegation or evidence that GM imposed Step 5 for discriminatory reasons.  Plaintiff admits GM suspended him for a period of 30 days under the Document 8 attendance policy, but recalls that the suspension occurred in May–June 2018.  GM's attendance records do not show any period of disciplinary suspension for Plaintiff in 2018.

GM did not immediately impose Document 8 discipline on Plaintiff for the January 16, 2018, absence because he did not return to work until March 28, 2018.  (Herina Decl. ¶ 21.)  Chris Welling, UAW Committeeman, testified he spoke with Plaintiff around March 18, 2018, and they discussed Plaintiff's impending termination based on his January 16, 2018, unexcused absence. Welling testified that his notes from the conversation "boiled down to if [Plaintiff] wasn't able to get coverage for the days that [GM] had him not covered, that it was going to be what it was going to be for his termination."  (Welling Dep. 89:19-90:3.)

On April 9, 2018, Plaintiff told GM Labor Representative Al Renaud that he filed a Charge of Discrimination with the Equal Employment Opportunity Commission because he was not being paid correctly and because he was being put on jobs that hurt his back.[20]  Approximately an hour later, Plaintiff attended a pre-scheduled Document 8 Disciplinary Interview with Chris Welling and Rowena Rutledge (Labor Relations Representative), which Plaintiff recorded.  Welling informed Plaintiff during the Disciplinary Interview that Plaintiff was currently on Step 5 of the Document 8 discipline program.  Welling also informed Plaintiff that the discipline for his absence on January 16, 2018, would be Step 6, which results in termination of employment.  During the same Disciplinary Interview, Welling reminded Plaintiff that his January 16, 2018, absence was not covered, so it was unexcused.  Plaintiff explained that he thought his January 16, 2018, absence was excused.  Rutledge told Plaintiff that his absences until March 28, 2018 were not covered, saying,

> Okay, so I understand everything that you're saying, right?  But where you were wrong is you didn't get the documentation that they asked for or some type of documentation explaining why you still needed to be on restrictions, what the treatment plan was, and if there was an end date or why there wasn't gonna be an end date. You still didn't get that from January 5[, 2018] up until May 28 – March 28, I'm sorry.  So you are missing like this whole gap of days

---

[20]Plaintiff filed his EEOC Charge of Discrimination on October 13, 2017.

that were not covered that [the nurse in Plant Medical] said she advised when you cancelled that one appointment that you wouldn't be covered. . . . .

That's where everything goes south.

(GM Ex. 19 at 48:18-49:1-7, ECF No. 101-26.)  Welling told Plaintiff, "Because they're saying [the nurse] told you as of this date, we're not covering anymore.  You have to go get covered by your doctor."  (Id. at 49:8-10.)  Both Welling and Rutledge advised Plaintiff to get the dates he missed work covered by a note from his own doctor.  (Id. at 52:9-12; 54:14-55:18, 62:2-5.) Rutledge told Plaintiff, "You need to have your doctor, whoever is treating you, cover you from January 5 up until March 28.  If it's restrictions, no restrictions–whatever the treatment plan is or whatever, whatever was going on with you, because that's the only way this is gonna go away." (Id. at 50:9-18.)  GM allowed Plaintiff time to produce documentation to show that his January 16, 2018, absence was excused pursuant to Document 8.

Following the Disciplinary Interview on April 9, 2018, Plaintiff never provided GM sufficient information or documentation to excuse his absence on January 16, 2018.  Plaintiff provided GM a doctor's note dated April 17, 2018, that released Plaintiff to return to work and stated in pertinent part:  "[Plaintiff] is under my medical care.  He has been under my care for back pain from January to March of this year.  He is restricted to not using hoist, no sweeping and limited bending and twisting.  His work restrictions end on July 20, 2018."  (GM Ex. DDDDD, ECF No. 100-3 at 3.)  The doctor's note does not purport to excuse Plaintiff from all work or excuse his absences that occurred from December 25, 2017, though March 27, 2018.[21]  As a result, GM approved the decision to discharge Plaintiff.

---

[21]Plaintiff also submitted a note from a nurse practitioner on February 16, 2018, but GM refused to accept it on the basis that it was not from a physician and lacked end dates.

Chris Welling and/or Plaintiff requested a special "Key 2 Review" of GM's decision to discharge Plaintiff.  George Herina, Director of Labor Relations at the Assembly Plant, describes the Key 2 Review as follows:

> 6.  The Key 2 Review is a process included in the collective bargaining agreement between General Motors and the UAW union. Employees who are covered by the collective bargaining agreement may request a Key 2 Review of any decision that will result in the termination of the employee's employment with General Motors. The Key 2 Review is typically conducted by the Director of Personnel (currently Joe Piechocki) and the UAW Chairman (currently Alan Chambliss).  On occasion, I have also been involved in the Key 2 Review process as Director of Labor Relations.

> 7.  During the Key 2 Review, the Director of Personnel and UAW Chairman review the facts and circumstances of the termination decision to decide whether extreme and unforeseen circumstances led to the termination decision.   In very rare situations, the termination decision can be reversed, and the employee is given a second chance (or another step in the disciplinary process).  In order for this to occur, both the Director of Personnel and the UAW Chairman must agree on the outcome.  In situations where the two disagree, the termination decision stands.

> 8.  Termination decisions are very rarely reversed as a result of a Key 2 Review.  For example, deaths in the family and illness would not support reversal of a termination decision in a Key 2 Review.  An unforeseen event completely out of the employee's control could result in a second chance.

(Herina Decl. #2 ¶¶ 6-8.)

GM reviewed the termination decision in a Key 2 Review on April 24, 2018.  The decision to discharge Plaintiff was upheld because the GM Director of Personnel and the UAW Chairman disagreed on the outcome.  As a result, on June 28, 2018, GM terminated Plaintiff's employment pursuant to Document 8 during a 76(a) Discipline Interview with Rowena Rutledge and Chris Welling.

<u>Others Discharged by GM for Attendance Under Document 8</u>

From January 1, 2015, through July 29, 2019, forty-six employees in addition to Plaintiff were discharged by GM under the Document 8 attendance policy.  Like Plaintiff, six of those forty-six employees had discipline that occurred twenty-four months or more prior to the date of discharge.  Of the six with discipline that occurred twenty-four months or more prior to the date of discharge, three were Black and three were white; two had filed workers' compensation claims.

<u>Plaintiff's Injuries and Illnesses During His Employment</u>

Plaintiff first reported an injury to his foot on February 20, 2015, resulting in absences from work.  After Plaintiff reported the foot injury he went to GM Plant Medical for evaluation, which sent him home based on his report that his foot was hurting.  Plaintiff did not work the following day, either.

From July 2015 to November 2015, Plaintiff missed work five to seven separate times, each time for a period of at least 8 days, due to stomach issues.

In the same timeframe, GM's records indicate Plaintiff took seven leaves of absence totaling 69 days missed.  With each leave of absence, Plaintiff followed the proper procedure and none of the absences were deemed "unexcused" under Document 8.

GM Plant Medical records reflect that Plaintiff was seen on January 31, 2016, February 11, 2016, and March 10, 2016, for a fractured finger.

On June 30, 2016, Plaintiff reported to GM Plant Medical that he had injured his low back while working the previous shift on the assembly line on position 115R.  At that time, position 115R was Plaintiff's permanently assigned position.  Plaintiff described position 115R as requiring him to lift a piece of equipment weighing approximately 25 pounds, put it onto his shoulder, and then "go in [to a van] and bolt it in" and then "go down and bolt something in front of it as well." For trucks, Plaintiff had to climb up in the truck and "sit in there" and "do some stuff inside the

truck as well," on a repetitive basis.  Based on the nature of the assembly line itself, GM could not modify position 115R to eliminate those physical requirements.[22]

On July 7, 2016, approximately eight days after his injury, Plaintiff sought medical treatment from his own physician.  Plaintiff did not work between June 28, 2016, and July 7, 2016.

<u>Plaintiff's Restrictions and Leave</u>

After reporting his back injury on June 28, 2016, Plaintiff was off work for approximately 650 days due to his back injury, including periods of paid and NJAWR leave.  First, GM provided Plaintiff approximately ten months of leave from June 28, 2016, to April 11, 2017, either because GM could not accommodate his restrictions or because his personal physician, Dr. Shenouda, concluded Plaintiff could not work.

From July 1, 2016, to September 20, 2016, GM could not accommodate Plaintiff and placed him on NJAWR status where his personal physician's work restrictions included the following at various points in time:

- No lifting or carrying more than 10 lbs.
- Occasionally lift no more than 20 lbs.
- Stand or walk 4-6 hours per day.
- Sit less than 3 hours per day.
- Very limited pushing and/or pulling.
- No sweeping, vacuuming or mopping.
- Very limited bending or stooping.
- No twisting.
- Limit walking to less than 4 hours per day.
- Limit bending at waist less than 45 degrees forward.

From September 22, 2016, to December 1, 2016, GM could not accommodate Plaintiff and placed him on NJAWR status where his personal physician imposed work restrictions which included the following:

---

[22]Plaintiff denies this fact but provides no citation to admissible evidence in the record to support it.  Plaintiff's denial therefore does not raise a fact dispute.

- No pushing, pulling more than 25 lbs.
- Rare lifting more than 50 lbs.
- No repetitive bending and twisting motions.
- No sweeping.
- No sitting/standing more than 30 minutes.
- Work for only 4 hours per day.

On November 29, 2016, prior to the upcoming NJAWR end date of December 1, 2016, Plaintiff's personal physician took Plaintiff off work until February 17, 2017.

On February 14, 2017, Plaintiff's personal physician issued the following work restrictions for Plaintiff:  "Frequent lifting permitted less than 25 lbs.  No pushing, pulling motions more than 25 lbs., rare lifting more than 50 lbs., no repetitive bending and twisting motions, and no sweeping."  GM could not accommodate these restrictions and placed Plaintiff on NJAWR leave through April 27, 2017.

Plaintiff returned to GM Plant Medical on April 12, 2017, prior to the April 27, 2017, NJAWR end date, for evaluation.

Plaintiff Enrolls in ADAPT

On or about April 12, 2017, Plaintiff signed the "ADAPT Program Entry" form that acknowledges he voluntarily entered GM's ADAPT program as of that date.  Plaintiff understood his participation in ADAPT was voluntary, designed to help place him in a position that accommodated his work restrictions.  Plaintiff also understood that for GM to approve a medical leave of absence while he was in ADAPT, he first needed a determination from ADAPT that it could find no jobs available with his restrictions, i.e., NJAWR.[23]

---

[23]Plaintiff denied this fact but his citations to Dr. Gupta's deposition do not support the denial. Further, Plaintiff was asked in his deposition, "You understood that you had to have the determination of no jobs available with restrictions from ADAPT before you could go out on leave?"  Plaintiff answered, "Yes.  A hundred percent.  Uh-huh."  (Pl. Dep. 261:16-19.)

Plaintiff was shown a video about the ADAPT program that lasted several minutes. A brief portion of the video showed a woman working at a "kitting" job. That particular job was not at the Wentzville Assembly Plant.

On April 13, 2017, upon Plaintiff's entry into ADAPT, Ron Brown, ADAPT representative for second/third shift, placed Plaintiff in a position that Brown determined accommodated Plaintiff's restrictions. After working the job for approximately three hours, Plaintiff requested a pass to GM Plant Medical, citing back pain, and was sent home for the balance of his shift by GM Plant Medical. Plaintiff remained on leave from April 13, 2017, through July 9, 2017. The DDR issued to Plaintiff on May 9, 2017, listed a NJAWR end date of July 9, 2017.

From April 13, 2017, to July 9, 2017, GM placed Plaintiff on NJAWR status as no jobs met his restrictions of limited standing less than 4 hours, no repetitive twisting and bending, and no sweeping.

On July 10, 2017, Plaintiff returned to work with restrictions he had received from Dr. Shenouda on July 9, 2017, including no frequent lifting more than 25 pounds, limited pushing and pulling less than 25 pounds, limited bending and twisting, and no sweeping, which GM honored. On July 10, 2017, Shara Houlihan, ADAPT representative for the first shift, placed Plaintiff on job 163R on first shift, a job that was temporarily available while its permanent occupant was on sick leave.

Plaintiff worked during the week of July 10, 2017, but then he did not return to work until August 1, 2017, which GM excused pursuant to a return to work note provided by Deanna Lambert, a nurse practitioner in Dr. Shenouda's office, allowing Plaintiff to return to work on August 1, 2017. When Plaintiff returned on August 1, 2017, GM placed Plaintiff on NJAWR status from August 1, 2017, to August 15, 2017.

26

On August 11, 2017, prior to the August 15, 2017, NJAWR expiration date, Plaintiff brought new restrictions to GM Plant Medical that included wearing a back brace, which GM provided to him.  On the same day, Houlihan placed Plaintiff in position 163R on the assembly line, which was open temporarily while another employee was on sick leave.

On August 22, 2017, Houlihan found a permanent placement for Plaintiff that accommodated his 6'5" height, as well as all of his restrictions.  Specifically, Houlihan assigned Plaintiff to position 80L Pit ("80L"), which she described as a "great job" and "perfect job" for Plaintiff, and stated that position 80L used a "baby hoist."

On August 30, 2017, Plaintiff went to GM Plant Medical complaining of "right thoracic pain."  Plaintiff returned to GM Plant Medical the next day complaining of low back pain.  He told Nurse Carolyn Dennis, "[M]y low back is hurting . . . and it's your job to do something about it."  On September 1, 2017, Plaintiff was disciplined for a Code of Conduct violation for excessive downtime on position 80L.  The discipline imposed was Plaintiff's suspension for the balance of his shift on September 1, 2017, and the following workday, which was September 5, 2017, due to the Labor Day holiday.  Plaintiff filed a Grievance with the UAW for the discipline imposed for the excessive downtime incident.  The Grievance was denied and Plaintiff served his disciplinary suspension without pay.

On September 6, 2017, the day he was scheduled to return following his suspension, Plaintiff visited GM Plant Medical and brought a note from a nurse practitioner stating he could not work until he was evaluated by physical therapy. GM Plant Medical advised Plaintiff to bring a new return to work slip and/or updated restrictions when they were available.  Thus, Plaintiff was excused from work until he could return with updated restrictions.

On September 12, 2017, Plaintiff saw his personal physician, Dr. Shenouda, and requested him to issue new restrictions that included a "no hoist" restriction.  On September 13, 2017,

Plaintiff gave GM Plant Medical his new restrictions that included the restriction of "no hoist." As a result of the "no hoist" restriction, position 80L no longer fit Plaintiff's restrictions.

On September 13, 2017, Houlihan placed Plaintiff in position 145L, which accommodated all of his restrictions.  Plaintiff worked one day on that job and did not return until October 2017.

On October 11, 2017, Dr. Shenouda provided Plaintiff a return to work release allowing him to return on October 12, 2017, without any restrictions.  Dr. Shenouda's records reflect that as of October 11, 2017, Plaintiff had his next appointment scheduled with Dr. Shenouda for December 5, 2017.

On October 16, 2017 at 6:24 a.m., four days after he was released to return to work, Plaintiff presented Dr. Shenouda's October 11, 2017, note allowing him to return to work with no restrictions to GM Plant Medical.  GM ultimately excused Plaintiff's absences until October 16, 2017, based on the return to work slip provided by Plaintiff that released him to return to work on October 12, 2017.

On October 16, 2017, GM assigned Plaintiff to a position on the assembly line, which Plaintiff worked.  The following day, on October 17, 2017, at 5:51 a.m., Plaintiff returned to GM Plant Medical with "updated restrictions that were not on [his] [return to work] note yesterday." The new restrictions included: "no using hoist, no sweeping, limited bending and twisting."

ADAPT UAW Representative Houlihan determined that no jobs available at GM fit Plaintiff's restrictions of October 17, 2017, and GM once again placed him on NJAWR leave through October 31, 2017.  On October 27, 2017, prior to the October 31, 2017, NJAWR end date, Plaintiff presented to GM Plant Medical for restriction review.  Plaintiff was seen by both Dr. Gupta and Nurse Dennis on that date.  Dr. Gupta told Nurse Dennis to "continue restrictions until Christmas."  On October 27, 2017, Nurse Dennis recalls telling Plaintiff "to provide new work

status before 12-26-2017 from personal physicians that are treating him," as reflected in GM's Plant Medical records.

GM's DDR, which GM Nurse Carolyn Dennis printed and gave to Plaintiff at his GM Plant Medical appointment on October 27, 2017, states, "May work with restrictions as listed above through 12-25-2017.  Follow up with personal physicians as scheduled."  Other employees treated by GM Plant Medical also had restrictions ending on or before December 25, 2017.

Because his restrictions as of October 27, 2017, included limited bending, twisting and stooping, no hoist, and no bending, GM placed Plaintiff on NJAWR status through Christmas/December 25, 2017.[24]

Plaintiff did not return to work or provide updated restrictions to GM on or before December 25, 2017.[25]

_____

[24]Plaintiff asserts that at the time of the October 27, 2017 appointment at GM Plant Medical, he "understood" or believed he was on NJAWR leave until he had absolutely no work restrictions, citing ¶ 43 of his Declaration but no evidence in the record.  Plaintiff's statement in ¶ 43 of his Declaration is contrary to the statement in the printed DDR that Nurse Dennis gave Plaintiff at the end of the appointment, which said, "May work with restrictions listed above through 12-25-2017."  Plaintiff does not cite record evidence to support his subjective understanding, and it does not create a fact dispute.

[25]Plaintiff denies this fact, citing a statement in his Declaration that he spoke to an unidentified female African-American nurse on the morning of December 25, 2017, who told him Dr. Gupta was on vacation, he did not need to come in to Plant Medical on Christmas, she would reschedule the appointment for January 16, 2018, when the plant reopened, and she did not instruct Plaintiff to provide any additional documentation to Plant Medical.  (ECF No. 109, Ex. 9 ¶ 44.)  GM objects that this statement is hearsay. GM is correct.  The statement is hearsay because it is an out-of-court statement offered to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  The Court therefore will not consider it.  On summary judgment, courts "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact."  Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800-01 (8th Cir. 2004) (citing Shaver v. Indep. Stave Co., 350 F.3d 716, 723 (8th Cir. 2003); Fed. R. Civ. P. 56(e)).  In addition, the statement in Plaintiff's Declaration differs from other evidence in the record.  Though his testimony is difficult to follow, Plaintiff testified that he called into Plant Medical on December 25, 2017 (Pl. Dep. 420:1-24), his appointment was rescheduled for January 15, 2017, but he had to cancel that appointment because he had the flu.  (Pl. Dep. 419:1-4:22:25.)  Then, in his recorded Disciplinary Interview held April 9, 2018, Plaintiff told Chris Welling, his UAW Committeeman/Representative, and Rowena Rutledge, GM Labor Representative, that he called Plant Medical on December 25, 2017, an unidentified nurse said Dr. Gupta was on vacation and for Plaintiff to call back when the Plant wasn't on shutdown after January 5, 2018; Plaintiff called Plant Medical on January 6 or 7, 2018, and asked when they wanted him to come in

29

On January 5, 2018, at 11:30 a.m., Deanna Lambert, a nurse practitioner in Dr. Shenouda's office, issued Plaintiff a Return to Work slip that allowed him to return to work on January 15, 2018, with the restrictions of "no using hoist, no sweeping, limited bending and twisting." Plaintiff did not return to work on January 15, 2018, or any time thereafter in January 2018.

In a telephone call on January 17, 2018, GM Nurse Dennis told Plaintiff that he "needs to present to medical with restrictions to be processed. We could not do it over the phone. Recommended that he come to medical with note from doctor." (Dennis Decl. ¶ 32.) This is consistent with GM's medical records on Plaintiff. On January 17, 2018, at approximately 10:03 p.m., Plaintiff faxed to GM a copy of the Return to Work slip from nurse practitioner Lambert dated January 5, 2018.

When Plaintiff did not appear at work on January 16, 2018, the day after he was released to return to work, GM coded his absence as "unexcused." Neither ADAPT Representative Houlihan nor anyone else from GM ever told Plaintiff that he did not need to go through the normal leave procedures. (Pl. Dep. 408:14-409:6.)[26] Plaintiff understood that he still needed to have his leave covered by a doctor. (Pl. Dep. 409:3-6.) Plaintiff admits that Houlihan didn't mention anything about covering his absences in January 2018. (Pl. Dep. 411:19-412:4.) Plaintiff understood that for each leave of absence, he had to bring a doctor's note to GM Plant Medical

---

to see the doctor, and "what they told me to do, they told me to come up there first to I guess give my new restrictions." (GM Ex. 19, 31:24-32:23, 39:15-43:21). Plaintiff also said he had an appointment with Dr. Gupta in February 2018 but had to cancel that appointment because he had the stomach flu. (Id. 43:9-44:1.) None of Plaintiff's evidence establishes a genuine dispute as to the fact that Plaintiff failed to either return to work or provide updated restrictions to GM Plant Medical on or before December 25, 2017.

[26]Plaintiff states in his Declaration, "Nurse Vonda told me I could fax in my restrictions when I felt well enough, which I did January 17, 2018. Nurse Vonda also told me that medical would cover me until I could get a new appointment." (Pl. Decl. ¶ 45.) GM objects that this statement is hearsay. GM is correct and the Court does not consider it. Plaintiff could have taken Nurse Vonda's deposition or obtained her Declaration but did not do so.

both to excuse his leave and to return to work.  This policy applies to all employees returning from a leave of absence.

Plaintiff also understood that GM needed an end date on his restrictions because the end date was the latest date when GM Plant Medical would reassess the restrictions and decide if there were jobs available within Plaintiff's restrictions.  (See Pl. Dep. 245:24-246:18; Houlihan Dep. 188:3-18; Brown Dep. 113:3-19.)  This policy applies to all employees returning from a leave of absence.[27]  Plaintiff admits that GM told him several times he needed a doctor's note with an end date for restrictions, in order to excuse his leave through the end date of those restrictions and to return to work upon their expiration.

Plaintiff communicated to his primary care physician, Dr. Shenouda, that his restrictions needed to have an end date.  Plaintiff likewise understood that he needed to bring a new doctor's note to GM Plant Medical upon the end date of the restrictions to extend the absence if he could not return to work.  This policy applies to all employees returning from a leave of absence.

On January 31, 2018, GM sent Plaintiff a letter instructing him to return to work or risk loss of seniority.  On February 6, 2018, Plaintiff went to GM Plant Medical for a return to work evaluation, with only the return to work note with restrictions issued on January 5, 2018.  Plaintiff was not permitted to return to work because GM Plant Medical would not process his Return to Work Slip that was a month old.

---

[27]Plaintiff neither admits nor denies this fact, but states, "Answering further, GM routinely accepted restrictions with no end dates."  As previously stated, that GM Plant Medical somtimes accepted Plaintiff's physician's restrictions that did not contain an end date does not mean it did not have a policy requiring physicians' restrictions to have end dates.  Further, to the extent GM relaxed its requirements in a manner that assisted or favored Plaintiff, this does not show the existence of a disputed fact as to discrimination, retaliation, or pretext.  Sandbach, 2020 WL 109591, at *5.

On March 1, 2018, Plaintiff returned to GM Plant Medical with a note from nurse practitioner Deanna Lambert dated February 16, 2018, that did not include an end date for the restrictions.  GM declined Plaintiff's return to work slip, and he remained on leave.

On March 28, 2018, Plaintiff returned to GM Plant Medical with a Return to Work Slip from Dr. Shenouda that allowed him to return to work without restrictions.  GM placed Plaintiff in a position on the assembly line the same day.  On April 9, 2018, Plaintiff went to GM Plant Medical complaining about job 174L on which he had been placed three days earlier.

On April 12, 2018, Plaintiff received restrictions from Dr. Shenouda that included "no using a hoist, no sweeping, limited bending and twisting."  Plaintiff presented the April 12, 2018, return to work slip to Nurse Dennis in GM Plant Medical on April 13, 2018.  The Return to Work Slip did not have an end date, so GM Plant Medical did not accept the restrictions.

On April 13, 2018, Nurse Dennis contacted Rowena Rutledge in the GM Labor Department about Plaintiff's return to work slip that lacked the required end date.  Nurse Dennis was present when Rutledge told Plaintiff he needed a valid end date for restrictions.  Nurse Dennis memorialized this conversation in her notes in the GM Plant Medical records.  Nurse Dennis told Plaintiff to return to GM Plant Medical when he had updated restrictions.

On April 19, 2018, Plaintiff's physician faxed new restrictions to GM Plant Medical that had an end date of July 20, 2018.  Nurse Dennis memorialized the faxed return to work slip in the GM Plant Medical records for Plaintiff.  On April 20, 2018, Plaintiff returned to GM Plant Medical for a return to work evaluation.  On the same day, GM placed Plaintiff on a job, where he worked until May 1, 2018.  Plaintiff was then off work from May 1, 2018, through June 11, 2018, on NJAWR status and sick leave.

On June 8, 2018, Dr. Shenouda provided Plaintiff work restrictions to begin on June 11, 2018, that included the following: "no bending below the waist, lifting, or twisting.  No assembly

32

line." Plaintiff returned to GM Plant Medical on June 12, 2018, for a return to work evaluation, and presented the "no assembly line" restriction. Plaintiff testified that he requested Dr. Shenouda to write the restriction for "no assembly line" work and Dr. Shenouda's testimony corroborates this. (Pl. Dep. 535:14-21; Shenouda Dep. 117:8-119:17.) Based on the "no assembly line" restriction, GM placed Plaintiff on NJAWR leave through July 20, 2018.[28]   No positions at GM can accommodate the restriction of "no assembly line" work. (Houlihan Dep. 173:1-174:24.)

On June 12, 2018, GM Plant Medical set Plaintiff's next appointment for restriction review on June 21, 2018, at 9:00 a.m. On June 21, 2018, Plaintiff went to GM Plant Medical for a follow-up evaluation. Plaintiff recorded the June 21, 2018, visit with Dr. Gupta and Nurse Dennis. Plaintiff was off work on NJAWR status until June 27, 2018, when he presented to GM Plant Medical with new restrictions that did not include the prior restriction of "no assembly line work."

During the time period 2015 through 2018, sixty-two employees were on NJAWR status for six months or longer.

Plaintiff's Job Placements Following his Injury

After Plaintiff injured his back, GM honored his bid to move from third to first shift. As a result of his move to first shift, Plaintiff ranked lower on seniority in comparison to his peers on first shift than he did on the third shift, which typically staffed less-tenured employees.

GM placed Plaintiff in nine different positions following his back injury, including at least one permanent placement on job 80L. As stated above, after reporting his back injury on June 28,

---

[28]On June 26, 2018, the day Plaintiff's employment was terminated, GM Plant Medical Director Dr. Gupta called Plaintiff's personal physician Dr. Shenouda to clarify the restrictions, as "no assembly line" meant Plaintiff could perform no jobs available to him. Dr. Gupta questioned how Plaintiff could be restricted from every job in the Plant without Dr. Shenouda having the benefit of knowing the physical requirements for each and every job. (Gupta Dep. 184:5-186:10; GM Ex. 3 at GMLS 2575.) Dr. Shenouda did not remember the conversation but said it was not the first time he had talked with another physician or other employer representative about restrictions Dr. Shenouda had issued (Shenouda Dep. 74:11-17, 76:7-77:14), and did not find it out of the ordinary that Dr. Gupta called him. (Shenouda Dep. 119:18-120:19.)

2016, Plaintiff was off work for approximately 650 days due to his back injury and other injuries and illnesses prior to his termination on June 28, 2018.

Plaintiff cannot identify a single position that he contends GM should have placed him in that met his physician's restrictions and was available to someone of his seniority either while he was on NJAWR status or during the course of this case.

GM has no positions that are part time and allow an employee to work less than eight hours per day.  During periods when Plaintiff had restrictions that included part-time work or work for less than eight hours in a day, there were no positions at GM that could accommodate those restrictions.  Plaintiff was not aware of any positions that would allow him to work only four hours per day.

GM has zero sedentary jobs in the Wentzville Plant available for UAW workers on the assembly line.  (Houlihan Dep. 88:7-9, 20-23.)  During periods when Plaintiff had restrictions that included "limit standing or walking" to less than 4 hours, there were no positions at GM that could accommodate those restrictions, in addition to Plaintiff's other restrictions such as no repetitive twisting or bending.

Plaintiff admitted during his deposition that any restrictions that included "limited" lifting, bending, and twisting would be difficult for GM to accommodate because "nothing at GM is limited.  When you have assembly line, when that job come, that job [is] coming eight hours a day. You got hundreds and hundreds of cars coming.  There's nothing limited about that.  So if you have any job where you're doing any twisting or any bending, then it's not limited."  (Pl. Dep. 285:10-23.)

GM has very few jobs on the assembly line that involve any sitting, or a combination of sitting and standing. [29]  Plaintiff cannot identify any specific jobs at GM that require no standing. [30]

Plaintiff generally claims that he could have performed a job in "kitting."  Kitting refers to a class of jobs that involve putting together "kits" of parts that are used by employees on the assembly line.  Kitting jobs are available in various departments including General Assembly.  Each department has multiple kitting positions, each of which has varying physical requirements, such as lifting, bending, twisting, and stooping.  Kitting positions are filled based on seniority like all other positions in the Assembly Plant.  There are no part-time kitting positions and no sedentary kitting positions.  All kitting positions require some degree of sitting and standing, and some degree of lifting, bending, and twisting.

Plaintiff has never identified a specific job in kitting that he could perform or that was within his level of seniority.  Plaintiff's Declaration states that he repeatedly requested a "kitting" position, and that he worked in a kitting position for a day and half while the employee permanently assigned to the job was absent (ECF No. 109, Ex. 9 ¶¶ 29-30), but Plaintiff does not offer evidence to identify a specific kitting position that was open and met his seniority.  Plaintiff admitted in his deposition testimony that he could not name a specific job that was open and met his seniority.  (Pl. Dep. 384:1-5; 523:20-524:5.)  When asked how many kitting positions were at the plant,

---

[29]Plaintiff identified a single job in the Trim department as a full-time sitting job.  In this job, the employee installs speakers in the bottom of the vehicle door, while sitting on a small chair and scooting around on it, following the job and moving with the assembly line.  The ADAPT UAW Representatives describe the job as a "very busy job," not sedentary, and "practically on the floor."  (Houlihan Dep. 33:7-23; Brown Dep. 98:8-20.)  Brown testified Plaintiff would be "way too tall for that [job]."  (Brown Dep. 98:10-13.)  There is also a "high-seniority" job in the tire room that involves sitting and standing, but Plaintiff would be "not even close to be able to do the operation because of seniority," and further could not do the job because it involves repetitive twisting and bending.  (Brown Dep. 96:1-98:7.)

[30]Plaintiff testified vaguely that he has "walked around the plant so I've seen jobs where, you know, someone don't – don't stand, or someone could – like kitting, you could stand or you can sit depending on the kitting job."  (Pl. Dep. 234:7-17.)  Plaintiff testified that the kitting job in which he was placed temporarily included both sitting and standing.  (Id. 234:17-21.)

Plaintiff stated, "There's a whole bunch of 'em over the plant, so I – I don't have that information. You gotta ask GM for that[.]"[31]  (Pl. Dep. 214:8-12.)  Plaintiff bid on one kitting position in the truck department but was not awarded the job.  (Pl. Decl. ¶ 35.)

Plaintiff's Wage Issues

Plaintiff claims that he worked the four days of July 10-14, 2017, but was not paid for two of the days he worked.  As a part of discovery in this case, Plaintiff produced a GM "Correction to Closed Payroll" record dated August 18, 2017, that shows 16 hours were corrected and added to his payroll.  The FSS Timekeeping Record states: "EE returned from S/L [sick leave] on 7.11.17 and was not set up in the TKS [Time Keeping System] so could not be properly coded.  EE was coded X [absent] on 7.13.17 and should have been coded VR [Vacation Restricted].  Please make correction."  (See GM Ex. KKKK.)  Documents produced by Plaintiff and in Plaintiff's possession show GM corrected the July 2017 payroll discrepancy within 30 days of the error, and well before his termination on June 28, 2018.[32]

Plaintiff also claims there was an instance where he worked fifteen hours but was only paid for thirteen hours.  He believes that occurred during the time he was working the position 80L. Plaintiff states he provided documentation to his UAW Committeeman, Chris Welling.  Welling testified he asked Plaintiff to bring in his pay stubs so Welling could check on the issue, but he did

---

[31]Plaintiff improperly attempts to shift his burden to GM to establish that there were jobs available that he could perform and that his seniority met, for example by claiming that GM failed to retain documents related to temporary open positions (i.e., 603 sheets and 63(b) sheets).  GM establishes that nothing in its document retention policies or within the UAW collective bargaining agreement requires it to retain these documents, and it does not do so because it "would require retention of large volumes of documents." (Herina Decl. #2 ¶ 13.)

[32]Plaintiff admits that he produced this document, but denies he ever received the 16 hours of pay. Plaintiff's denial is not supported by any evidence other than his own self-serving testimony, and GM has produced documents kept and maintained in the ordinary course of business that show Plaintiff was paid. No material dispute of fact exists, as this is a mere payroll error that is not evidence of discrimination where there is no evidence it was motivated by Plaintiff's race or disability.

not recall Plaintiff ever providing him documentation supporting the claim that Plaintiff was underpaid his wages.  Welling, who was elected by the UAW members in the 1st Shift Trim Department, was tasked with assisting UAW members like Plaintiff with employment-related issues.  (Herina Decl. #2 ¶ 3 (ECF No. 129-1).)  Plaintiff has not offered any evidence that Welling's testimony is disingenuous in his belief that Plaintiff never provided any documentation, Plaintiff has no evidence that anyone responsible for GM payroll ever received documentation concerning the alleged pay shortage, and Plaintiff has no evidence that this alleged minor error in his pay concerning two hours was attributable to discriminatory animus.

Plaintiff claims he did not receive pay raises and bonuses like other employees received. GM records show that Plaintiff received pay increases in accordance with the National and Local CBA on the following dates:

- January 12, 2015 – starting salary $15.78 per hour
- November 23, 2015 – increase to $17.00 per hour
- April 4, 2016 – increase to $18.00 per hour
- April 12, 2017 – increase to $19.50 per hour
- October 16, 2017 – increase to $21.00 per hour

Plaintiff testified that he did not receive a raise in 2016 but his testimony is self-serving, based on hearsay–alleged statements of coworkers–(see Pl. Dep. 552:13-14), is not supported by any other evidence, and is contradicted by GM's business records and the Declaration of George Herina, GM's Director of Labor Relations, which states, "Based upon my review of Plaintiff's salary and employment history with GM, Plaintiff was given all raises and bonuses due to him under the collective bargaining agreement."  (Herina Decl. #2 ¶ 15.)

Each time GM placed Plaintiff in a new position, he maintained his level of pay and continued to receive pay increases like all other UAW hourly employees.  (Herina Decl. ¶ 70.) Plaintiff denies this, but his denial is unsupported by anything other than his self-serving

testimony, and it directly contradicted by the record.  GM records show that Plaintiff received

additional pay in accordance with the National and Local CBA on the following dates:

- November 23, 2015 – Settlement Bonus $8,000
- November 30, 2015 – Quality Bonus $500
- February 15, 2016 – Profit Sharing Bonus $8,628.76
- May 31, 2016 – Performance Bonus $1,000
- February 13, 2017 – Profit Sharing Bonus $2,782.70
- May 31, 2017 – Performance Bonus $1,000
- November 28, 2017 – Quality Bonus $500
- February 12, 2018 – Profit Sharing Bonus $1,425.24
- May 31, 2018 – Performance Bonus $1,000

Plaintiff's Workers' Compensation Claims

In April 2016, Plaintiff filed his first workers' compensation claim arising out of the injury

to his foot.  On or about July 27, 2016, Jackson filed a workers' compensation claim arising out of

the injury to his back that allegedly occurred during the course of his employment in June 2016.

Plaintiff could not identify anyone at GM who knew about his workers' compensation claims other

than one coworker–another UAW member working the assembly line–and a UAW committeeman

he told "after the fact" after he returned to work.  (Pl. Dep. 392:9-394:23.)

Plaintiff remained employed at GM for nearly two years after he filed his workers'

compensation claims.  From 2015 to 2018, 3,216 workers' compensation claims were filed by

employees at the GM Assembly Plant in Wentzville, Missouri.  Of the employees who filed claims,

a majority remain employed by GM.

Plaintiff had incurred Attendance Improvement Steps 1 through 5 of the Document 8

progressive disciplinary process prior to his June 28, 2016, alleged back injury, and prior to filing

his workers' compensation claim arising out of his alleged back injury,

Plaintiff's Charges of Discrimination

On October 13, 2017, during his employment, Plaintiff filed a Charge of Discrimination

with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment

Opportunity Commission ("EEOC") alleging disability discrimination and retaliation.  On July 12, 2018, Plaintiff filed a second Charge of Discrimination with the EEOC alleging discrimination based on race, disability, and retaliation.

Plaintiff had incurred Attendance Improvement Steps 1 through 5 of the Document 8 progressive disciplinary process prior to filing either charge of discrimination.

<u>Plaintiff's Allegations of Race Discrimination</u>

Plaintiff's allegations of race discrimination in his second EEOC Charge of Discrimination and in this lawsuit relate to his claim that Plant Medical Director Dr. Gupta treated him unfairly based on Plaintiff's race.

Plaintiff had incurred Attendance Improvement Steps 1 through 5 under the Document 8 disciplinary policy before he ever was treated by Dr. Gupta.  Plaintiff's first appointment with Dr. Gupta in GM Plant Medical was on March 2, 2017.  From March 2017 until June 28, 2018, Dr. Gupta saw Plaintiff in GM Plant Medical on eight occasions.  Without Dr. Gupta's knowledge, Plaintiff recorded two of his eight interactions with Dr. Gupta (Jackson Voice 03 was recorded on March 1, 2018, and Jackson Voice 010 was recorded on June 21, 2018).  (Pl. Dep. 522:1-14.) Although they are not verbatim transcripts, the substance of the medical notes in GM Plant Medical records for these visits matches the content of both voice recordings.

On Jackson Voice 010, Plaintiff can be heard saying that it is Dr. Gupta's job [and thus GM's responsibility] to find him a job.  When asked what about those discussions was discriminatory, Plaintiff testified he did not hear anything rude or gruff or offensive during either recording.  Plaintiff did testify Dr. Gupta was "inappropriate" for "him talking when he asked me a questions, and we actually was out talking each other.  Because if I feel someone is not respecting me, I'm not going to respect you."  (Pl. 522:15-12.)  Plaintiff also testified it was inappropriate for Dr. Gupta to "keep mentioning assembly line, assembly line, assembly line, you know" when

Plaintiff was "asking him and telling him that I –they would try to find me a job off the line."  (Id. 523:11-19.)

Plaintiff testified that Dr. Gupta never made any inappropriate racial jokes, slurs, or statements.  (Pl. Dep. 524:6-12; 526:21-23.)  Plaintiff testified, "Nothing he said to me" made Plaintiff think Dr. Gupta was racist, it was "[j]ust the way he talked to me."  (Id. 525:12-18.) Plaintiff was asked, "So you can't point to any comment that Dr. Gupta ever made to you that was based on race?" and he answered, "No."  (Id. 526:18-20.)  Plaintiff testified that Dr. Gupta was rude to him but he saw Dr. Gupta be polite and friendly "with other non-African-American men." (Id. 399:69.)

Plaintiff testified, "Only one thing was that, you know, like I guess the stereotype, you know, black men lazy.  So he always wanted to basically saying how I was going to stay at home, or how, you know, how much money[.]"  (Pl. Dep. 526:23-527:1.)  Plaintiff was asked, "[D]id he ever say you were lazy?"  He answered, "He said I just want to stay at home."  (Id. 527:6-9.) Plaintiff expanded on this testimony as follows:

> Q.  So he told you in some conversation that he felt like you just wanted to stay home?
>
> A.  Yeah, he said just staying at home, not doing nothing, you know, so that's how he talked to me.
>
> Q.  I understand that's your testimony.  How does that relate to race?
>
> A.  You don't have to – Okay.  All right.  He doesn't say any racial slurs or anything like that.
>
> Q.  He didn't say black men are lazy and I think you want to stay at home?
>
> A.  No, he did not.  No, he did not say that.
>
> Q.  He just said it looks like you want to stay home?
>
> A.  Yeah.  That's what he said.

> Q.  And you're connecting that to race because of a stereotype that black men are lazy?
>
> A.  Yeah, Yeah.  There you go.

(Pl. Dep. 528:9-529:2.)

Plaintiff also testified he thought Dr. Gupta's treatment of him was based on race because "the fact what other people said," (Pl. Dep. 524:24-525:9), i.e., Dr. Gupta's alleged treatment of other African Americans at the plant, based solely on Plaintiff's testimony of what others allegedly told him.  (Pl. Dep. 524:19-525:16.)  This testimony is hearsay that the Court disregards on summary judgment.

Plaintiff admits Dr. Gupta had no role in the decisions to discipline and discharge him under Document 8, and that Dr. Gupta did not make the decision whether to place Plaintiff in any positions following his restrictions.  (Pl. Dep. 399:5-16, 402:9-403:23; Gupta Decl. ¶¶ 24-25.) Plaintiff admits that ADAPT and Labor Relations Representatives made the decisions on whether to place him.  Plaintiff testified he nonetheless believes Dr. Gupta had a say-so in his discipline. Plaintiff has no evidence to support this self-serving testimony, it is contrary to Plaintiff's own testimony and record evidence, and it does not create a fact dispute.

Plaintiff described Dr. Gupta as "combative" and "pretty gruff."  (Pl. Dep. 397:2-25.)  GM has received complaints from both men and women, and Caucasian and African-American employees, that Dr. Gupta is "rude" and has poor bedside manner.  UAW Committeeman Chris Welling testified he did not have any conversations with Plaintiff about Dr. Gupta, but other UAW members had complained about Dr. Gupta though none of the complaints were race-related. (Welling Dep. 33:4-17.)  GM Plant Medical Nurse Dennis stated in her Declaration that she is personally aware Dr. Gupta has been told by members of his GM Plant Medical nursing staff– a majority of whom are Caucasian females–that he comes across as abrupt or rude sometimes. (Dennis Decl. ¶ 41.)  Nurse Dennis further stated that based on her personal interactions with Dr.

Gupta and his patients, he treats everyone the same, regardless of race or disability status.  (Id. ¶ 43.)  Dr. Gupta's Declaration states that members of his GM Plant Medical nursing staff have told him he sometimes comes across as abrupt or rude.  (Gupta Decl. ¶ 53.)

Plaintiff testified that he believes Dr. Gupta called his personal physician, Dr. Shenouda, to change his work restrictions to retaliate against Plaintiff and "get rid of [him]," because Dr. Gupta was working for GM.  (Pl. Dep. 531:10-532:21.)  Dr. Gupta testified that on June 26, 2018, he called Dr. Shenouda to clarify the restriction for "no assembly line" work for Plaintiff, as this meant Plaintiff could perform no jobs available to him.  Dr. Gupta questioned how Plaintiff could be restricted from every job in the Assembly Plant without Dr. Shenouda having the benefit of knowing the physical requirements for each and every job.  (Gupta Dep. 184:5-186:10; GM Ex. 3 at GMLS 2575.)

Dr. Shenouda testified he did not remember the conversation with Dr. Gupta but said it was not the first time he had talked with another physician or other employer representative about restrictions Dr. Shenouda had issued, as he had received too many employer calls over the course of his career to count.  (Shenouda Dep. 74:11-17, 76:7-77:14.)  He did not find it out of the ordinary that Dr. Gupta made the call to him.  (Id. 119:18-120:19.)  After reviewing his chart and a note he prepared after the call, Dr. Shenouda testified that he and Dr. Gupta collaborate (id. 74:18-22), and talked about:

> how we can do it with a little restrictions we can resolve the work situation.  Because obviously Mr. Jackson wanted to go back to work.  He's tried so many times, and the restriction that we give him apparently was not doable or it's not as much as [GM] wanted to, so.  So we kind of gave in a little bit and they gave in a little bit and try to make it work, so.

(Id. 76:19-77:6.)

Dr. Gupta testified it is "commonplace" for physicians to consult one another with regard to restrictions, especially where a clarification was needed.  He has consulted with the personal

physicians of numerous GM employees including both Black and white employees, and employees with both minor and significant medical issues.  (Gupta Decl. ¶¶ 48-49.)

**Discussion**

    A.  <u>Plaintiff's ADA and MHRA Discrimination Claims</u>

    The ADA prohibits private employers from discriminating against a "qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA bars acts of discrimination including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability."  42 U.S.C. § 12112(b)(5)(A).  To establish a prima facie case of discrimination under the ADA, Plaintiff must show that he "(1) is disabled within the meaning of the ADA, (2)is a qualified individual under the ADA, and (3) suffered an adverse employment decision because of the disability."  <u>Faidley v. United Parcel Serv. of Am., Inc.</u>, 889 F.3d 933, 940 (8th Cir. 2018) (en banc) (quoted case omitted).  A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires."  42 U.S.C. § 12111(8)."  <u>Faidley</u>, 889 F.3d at 940.

    As for Plaintiff's MHRA claims, federal courts "primarily apply Missouri law but may also apply federal employment discrimination law to the extent federal law is 'applicable and authoritative under the MHRA.'"  <u>Heuton v. Ford Motor Co.</u>, 930 F.3d 1015, 1019 (8th Cir. 2019) (quoted case omitted).  Comparably, "In deciding a case under the MHRA, [Missouri] appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law."  <u>Li Lin v. Ellis</u>, 594 S.W.3d 238, 242 (Mo. 2020) (en banc) (per curiam) (quoted case omitted).  To establish an MHRA disability discrimination claim, Plaintiff must show (1) he has a disability, (2) GM "took an adverse action against him," and (3) "his disability was a factor in the adverse action."  <u>Heuton</u>, 930 F.3d ay 1019 (quoted case omitted).

Following the MHRA's 2017 amendment, effective August 28, 2017, "an employer violates the MHRA if the employee's protected status was the *motivating factor* in an adverse employment action." Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 794 (Mo. Ct. App. 2018); see § 213.010(2), Mo. Rev. Stat. (2017). "This new standard is analogous to the one used in employment discrimination claims under federal law, and imposes a higher burden upon the employee than the prior 'contributing factor' standard." Bram, 564 S.W.3d at 794-95.[33]

GM does not dispute that Plaintiff's physical impairments were disabling or that his termination was an adverse employment action. GM moves for summary judgment on the basis that Plaintiff cannot meet his initial burden of showing he was qualified to perform the essential functions of his job, either with or without reasonable accommodations, citing Gardea v. JBS USA, LLC, 915 F.3d 537, 541 (8th Cir. 2019). GM focuses on Plaintiff's permanent job working position 115R on the assembly line, which required him to bend, twist, stoop, and lift, all of which

---

[33]The Court disagrees with Plaintiff's assertion that the "contributing factor" standard applies to his MHRA claims. The new "motivating factor" standard applies to "actions accruing on or after August 28, 2017." Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 795 (Mo. Ct. App 2018) (quoting Missouri Approved Instruction 38.06 [2018 New]). Under Missouri law, claims accrue "when the damage . . . is sustained and is capable of ascertainment." Mo. Rev. Stat. § 516.100 (2010). The MHRA is silent as to when claims accrue under the Act, but this Court has held an MHRA claim accrues when the alleged discriminatory conduct occurred. Marshall v. Walgreen Co., 2018 WL 3025813, at *2 (E.D. Mo. June 18, 2018) (noting also, "Under federal law, an employee's claim of discrimination accrues when the alleged discriminatory action occurs, e.g., for wrongful discharge, when the employee is fired. 'At that point ... he has a "complete and present cause of action."' Green v. Brennan, 136 S. Ct. 1769, 1777 (2016).").

Here, Plaintiff's case accrued after August 28, 2017, because it is based on alleged discriminatory conduct that occurred primarily after August 28, 2017. Plaintiff's first EEOC Charge of Discrimination was filed October 13, 2017 (Complaint, Ex. A); his employment was terminated on June 26, 2018, and his second Charge of Discrimination was filed July 12, 2018 (Complaint, Ex. C). To the extent Plaintiff alleges discriminatory conduct occurred with respect to failure to accommodate him in job placements prior to August 28, 2017, this does not warrant application of the contributing factor standard as his case had not fully accrued by that date. Plaintiff did not have a "complete and present cause of action" because he had not suffered an adverse employment action. Moreover, because the Court finds that Plaintiff is not "disabled" within the meaning of the MHRA, his claim fails under either standard.

Plaintiff admits he could not perform as his physician proscribed those activities continually from June 2016 through March 2018.

Plaintiff does not contend, however, that he could have performed the essential functions of position 115R with or without reasonable accommodation, or that GM discriminated against him with respect to that position.  "The inquiry of whether an employee is a qualified individual is not limited to the employee's existing job, but instead, under certain circumstances, may also include other company jobs that the disabled employee desires."  Minnihan v. Mediacom Commc'ns Corp., 779 F.3d 803, 810 (8th Cir. 2015) (quoting Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1017 (8th Cir. 2000)).

GM also argues it is entitled to summary judgment because it accommodated Plaintiff repeatedly by granting him more than twenty-two months of leave, paid and unpaid, and reassigning Plaintiff to nine different positions that met his work restrictions following his back injury, in response to changing work restrictions from Plaintiff's physician and Plaintiff's complaints of back pain with each job.

Plaintiff responds that summary judgment is not proper because GM discriminated against him on the basis of his disability when it (1) failed to make reasonable accommodations for his disability by placing him in physically demanding positions that were not in line with his disability restrictions; and (2) failed to engage in the interactive process in good faith because it placed him only in physically demanding jobs that exacerbated his injures.

### 1.  ADA Failure to Accommodate Claim

To prevail on his failure-to-accommodate claim, Plaintiff "must first make a facial showing that he has an ADA disability and that he has suffered [an] adverse employment action.  Then he must make a facial showing that he is a 'qualified individual.'"  Fenney v. Dakota, Minn. & E. R. Co., 327 F.3d 707, 712 (8th Cir. 2003).  "When the employee has made his facial showing, the

burden then shifts to the employer to show that it is unable to accommodate the employee."
Gardea, 915 F.3d at 541 (quotation marks and quoted case omitted).

After Plaintiff injured his back, GM provided him with approximately ten months of paid
leave from late June 28, 2016 to April 11, 2017, because GM could not accommodate his work
restrictions and/or Plaintiff's doctor concluded he could not work.  Once Plaintiff's paid leave was
exhausted, GM placed him on unpaid "No Jobs Available with Restrictions" ("NJAWR") status
from April 13, 2017, to July 9, 2017, because no jobs were available that met Plaintiff's physician's
restrictions of limited standing less than four hours, no repetitive twisting and bending, and no
sweeping.  Leave can be a reasonable accommodation, and the Court concludes it was in this case
when no jobs existed in the Assembly Plant that met Plaintiff's limitations.  See Brannon v. Luco
Mop Co., 521 F.3d 843, 849 (8th Cir. 2008) (noting that "a medical leave of absence might, in
some circumstances, be a reasonable accommodation" under the ADA).

After Plaintiff's physician modified his work restrictions and Plaintiff entered GM's
ADAPT program, GM reassigned him to nine different positions.  "If an employer has offered
reassignment as a reasonable accommodation, then the employee must offer evidence showing
both that the position offered was inferior to [the employee's] former job and that a comparable
position for which the employee was qualified was open."  Gardea, 915 F.3d at 542 (quoting
Kallail v. Alliant Energy Corp. Servs., Inc., 691 F.3d 925, 933 (8th Cir. 2012)).

Here, Plaintiff fails to make a facial evidentiary showing that he is a qualified individual
because he does not offer any admissible evidence that the positions he was offered were inferior
to his former position or that a comparable position for which he was qualified was open.  Plaintiff
does not dispute that the reassignments he was offered were at the same rate of pay and hours as
his original position.  Plaintiff's Declaration states that he requested a "kitting" position and
worked in such a position for a day and half while the regular employee was away (ECF No. 109,

46

Ex. 9 ¶¶ 29-30), but he does not offer evidence to identify a specific position that was open and that his seniority met.  Plaintiff admitted in his deposition he could not name a specific job that was open and met his seniority.  (Pl. Dep. 384:1-5; 523:20-524:5.)  When asked how many kitting positions were at the plant, Plaintiff answered, "There's a whole bunch of 'em over the plant, so I – I don't have that information.  You gotta ask GM for that[.]"  (Pl. Dep. 214:8-12.)

Plaintiff's evidence is only that he wanted and thought he could perform a kitting position and that there were numerous kitting positions in the Assembly Plant.  The uncontroverted evidence is that "kitting" is a class of jobs available in various departments, each of which has varying physical requirements.  Kitting positions are filled based on seniority like all other positions in the Plant, and there are no part-time or sedentary kitting positions.  All kitting positions require some degree of sitting and standing, and some degree of lifting, bending, twisting and stooping.  As a result, Plaintiff's assertion that there were numerous kitting jobs in the plant is far short of what he must establish.

Plaintiff fails to establish either that the job reassignments GM gave him were inferior to his prior permanent job, or that there was a comparable, open position for which he was qualified that met his seniority.  The Eighth Circuit has long held that a "qualified individual with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation."  Minnihan, 779 F.3d at 813.  Plaintiff therefore fails to establish a prima facie case of failure to accommodate.  Gardea, 915 F.3d at 542; Kallail, 691 F.3d at 933; see also Manning v. General Motors, 529 F.Supp.2d 1282, 1290 (D. Kan. 2008) (granting summary judgment to GM where the "record is devoid of any evidence that specific jobs were available within the company at the time a request for reassignment or transfer would have been made had [plaintiff] been given the opportunity to make that request."); Selecki v. General Motors, 2015 WL 1286961, at *5 (E.D. Mich. Mar. 20, 2015) (granting summary judgment on failure to accommodate claim where

plaintiff "failed to come forward with any evidence showing the plant had an available one-handed position when he was placed on restriction[.]").  GM is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

### 2.   MHRA Disability Discrimination Claim

"A claim of disability discrimination under section 213.111 of the MHRA requires a plaintiff to show that: (1) the plaintiff is legally disabled; (2) the plaintiff was discharged; and (3) the disability was a factor in the plaintiff's discharge."  Hervey v. Missouri Dep't of Corr., 379 S.W.3d 156, 160 (Mo. 2012) (en banc.)  The MHRA defines "disability" as "a physical or mental impairment which substantially limits one or more of a person's major life activities . . . which with or without reasonable accommodation does not interfere with performing the job[.]" § 213.010(5), Mo. Rev. Stat.  Missouri courts interpret the "statutory definition of disability as having two parts: 1) a person must have an impairment that limits major life activity; and 2) with or without reasonable accommodation, that impairment must not interfere with performing the job[.]"  Folsom v. Missouri State Highway Patrol, 580 S.W.3d 645, 651 (Mo. Ct. App. 2019) (quoted case omitted).  "Unlike its counterpart federal statutes, the Missouri Human Rights Act 'makes the question of whether the job can be performed with or without reasonable accommodation a part of the test to determine whether an employee is disabled.'"  Id. (quoting Medley v. Valentine Radford Commc'ns, Inc., 173 S.W.3d 315, 320 (Mo. App. W.D. 2005)).

Under Missouri law,

> Reasonable accommodation does not require an employer to find another job for an employee who is unable to perform the job he was doing, but an employer cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.  A plaintiff must show not only that an alternative position was vacant, but that he was qualified for that position.

Folsom, 580 S.W.3d at 651 (Mo. Ct. App. 2019) (quoting Snyder v. ICI Explosives USA, Inc., 938 S.W.2d 946, 949 (Mo. App. S.D. 1997)).

As discussed above with respect to Plaintiff's ADA claim, Plaintiff fails to identify an available, open position he could have been assigned to that his seniority met.  In Folsom, the plaintiff identified the attributes of the type of position he wanted but never specifically identified any open positions to which he wished to transfer.  Id.  The Missouri Court of Appeals found the plaintiff's testimony that he knew his employer "had all kinds of jobs there, but [he] didn't specifically request a job," and his inability to identify a particular, available position into which he could have been transferred, failed to create a genuine issue of material fact as to whether the plaintiff was "disabled" under the MHRA and warranted summary judgment.  Id. at 652.

This case is comparable to Folsom.  Plaintiff testified that he wanted a kitting job, asked for a kitting job, and GM had "a whole bunch" of kitting jobs, but this testimony does not identify a particular, available job into which Plaintiff could have been transferred and that his seniority was sufficient for.  As a result, Plaintiff's testimony is insufficient to create a genuine issue of material fact as to whether Plaintiff was "disabled" within the meaning of the MHRA.  GM is entitled to summary judgment on Plaintiff's MHRA claim in Count III.

### 3.   Failure to Participate in Interactive Process

Plaintiff's claim that GM failed to participate in the interactive process in good faith also fails.  "An employee with a disability must show the following elements to establish his employer failed to participate in the interactive process:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

Id. at 813 (quoting Cravens, 214 F.3d at 1021.)  The first two elements are undisputed as GM knew about Plaintiff's disability, and Plaintiff requested assistance for his disability.

The Court finds that GM engaged in the interactive process in good faith as a matter of law.  As previously discussed, after Plaintiff injured his back GM provided him with approximately ten months of paid leave from late June 28, 2016 to April 11, 2017, either because GM could not accommodate his restrictions or Plaintiff's physician concluded he could not work. Once Plaintiff's paid leave was exhausted, GM placed him on unpaid NJAWR status from April 13, 2017, to July 9, 2017, because no jobs were available that met Plaintiff's physician's restrictions of limited standing less than four hours, no repetitive twisting and bending, and no sweeping, among others.

When Plaintiff's work restrictions were modified by his physician so that he could perform some jobs, he voluntarily participated in GM's ADAPT program, which exists to find temporary positions for workers unable to do their regular jobs because of restrictions or disabilities.  ADAPT is staffed by two UAW Representatives whose primary job function is to place ADAPT participants in open positions that meet the employees' restrictions and seniority under the National Collective Bargaining Agreement.  Through ADAPT, GM placed Plaintiff in nine different jobs of varying descriptions on his shift, the first shift, each of which GM believed met Plaintiff's restrictions.  If Plaintiff complained that a job hurt his back when he performed it, GM removed him from the job and sent him to ADAPT or Plant Medical.[34]

---

[34]Plaintiff argues that some jobs he was reassigned to did not meet his physician's work restrictions because they hurt his back.  As discussed above in the Facts section, whether a particular job met Plaintiff's work restrictions is a separate issue from whether it hurt his back to perform the job.  Plaintiff's argument conflates these issues and is not supported by evidence that any of the proffered jobs failed to meet his restrictions.

On several occasions, Plaintiff brought new work restrictions from his physician specifically to exclude a job he had been placed into as an accommodation, but that he said caused him back pain. Plaintiff admits he asked his physician to put into a note the limitations of no use of a hoist, no sweeping, and no assembly line work. Each time Plaintiff complained that a job hurt his back or brought new restrictions from his physician, GM continually sought to accommodate his changing requirements and looked for new job reassignments that met Plaintiff's restrictions. Plaintiff was satisfied with a temporary kitting job, but he could not retain it because it was the permanent job of a more senior employee and thus was not open. Plaintiff bid on a kitting job that he wanted but he did not have the seniority to obtain it. Given these extensive efforts by GM, a reasonable jury could not find that it acted in bad faith. Faidley, 889 F.3d at 944. GM is entitled to summary judgment on this claim.

## B. Plaintiff's Retaliation Claims

### 1. ADA Retaliation

Although Plaintiff's disability discrimination claim fails, he "may still pursue a retaliation claim under the ADA as long as [he] had a good faith belief that the requested accommodation was appropriate." Heisler v. Metro. Council, 339 F.3d 622, 632 (8th Cir. 2003) (quotation marks and quoted case omitted). The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). "To survive a motion for summary judgment on a retaliation claim, [a plaintiff] must offer direct evidence of retaliation or create an inference of retaliation under the McDonnell Douglas burden-shifting framework."[35] Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016).

---

[35] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

To establish a prima facie case of retaliation a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two.  Hill v. Walker, 737 F.3d 1209, 1218 (8th Cir. 2013).  "A retaliation claim under the ADA requires a but-for causal connection between the employee's assertion of his ADA rights and an adverse action by the employer."  Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013)).  The McDonnell Douglas framework 'requires only a minimal showing before requiring the employer to explain its actions')."  Wierman v. Casey's Gen. Stores, 638 F.3d 984, 994 (8th Cir. 2011).

Once the plaintiff meets this burden, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  If the defendant satisfies its burden, the plaintiff must show that the defendant's reason is pretext for unlawful discrimination.  See E.E.O.C. v. Product Fabricators, Inc., 763 F.3d 963, 972 (8th Cir. 2014).  Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Here, Plaintiff filed an EEOC Charge of Discrimination on October 13, 2017, complaining that despite his medical restrictions, GM placed him in positions that furthered his injuries although positions existed he could perform without accommodation, and was not paying him properly. (ECF No. 31-1, Ex. A.)  Plaintiff also made multiple requests for accommodation with respect to placement in different positions.  He therefore engaged in protected activity.  Plaintiff was terminated from employment on June 28, 2018, so the adverse action element is met.

Plaintiff asserts that he establishes causation because (1) he repeatedly requested the reasonable accommodation of positions that met his work restrictions but GM did not place him

in appropriate positions, and each of these requests were protected activity; and (2) he told a GM representative on April 9, 2018, that he filed an EEOC charge because he was not being paid correctly and was being placed only in positions that exacerbated his injuries, and one hour later was called to a disciplinary interview and informed that GM wanted to terminate his employment. GM strongly disputes that Plaintiff establishes the causation element of his prima facie case, but the Court is mindful "the threshold of proof necessary to establish a prima facie case is minimal." Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005). The Court assumes Plaintiff has established a prima facie case of retaliation.

The burden of production therefore shifts to GM to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. GM asserts that Plaintiff was discharged for attendance violations under Document 8 of the National CBA, a contractually mandated progressive attendance policy that outlined the consequences of an employee's failure to show up at work when scheduled. Reliance on the Document 8 attendance policy is a facially legitimate, non-retaliatory justification for Plaintiff's termination and satisfies GM's burden at this stage. Compare Cloke v. Federal-Mogul Ignition Co., 2019 WL 3976324, at *8 (S.D. Iowa May 21, 2019) (violation of three-day no call/no show rule in collective bargaining agreement was a legitimate, non-retaliatory reason justifying the plaintiff's termination).

Plaintiff must now show that GM's proffered legitimate, non-retaliatory reason for his termination, his attendance violations under Document 8, is pretext for unlawful discrimination. "To survive summary judgment, an employee must both discredit the employer's articulated reason and demonstrate the 'circumstances permit a reasonable inference of discriminatory animus.'" Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014) (quoting Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2011)). "An employee's attempt to prove pretext requires more substantial evidence of discrimination than required to make a prima

facie case because [courts] view this evidence in light of the reasons articulated by the employer." Id. (cited cases omitted).  Ultimately, Plaintiff must show that retaliation was the "but-for" cause of his termination.  See Oehmke, 844 F.3d at 758.

As an initial matter, although there is evidence many GM employees received discipline under Document 8, there is no evidence GM used Document 8's attendance policy to retaliate generally against employees who requested disability accommodations or engaged in other protected activity.[36]  Plaintiff argues that while GM's stated reason for termination under Document 8 is an alleged unexcused absence on January 16, 2018, it did not actually terminate him until June 28, 2018, and this gap in time shows that GM's reason is nothing more than pretext. In support, Plaintiff cites Ryther v. KARE 11, 108 F.3d 832, 841 (8th Cir. 1997) (long delay between non-discriminatory reason for dismissal and actual dismissal suggested defendants had age-based discriminatory agenda to terminate plaintiff).

Here, the delay between Plaintiff's January 16, 2018, absence from work that formed the basis for the final step under Document 8 and his termination does not establish a genuine issue of fact as to pretext.  Plaintiff did not even return to the plant until approximately March 28, 2018, so his absences contributed to the delay, as did GM's policy of issuing all discipline in person. Plaintiff was advised in mid-March 2018 by Chris Welling, his UAW Committeeman, that discharge was likely because of the absence; and he appeared at a disciplinary hearing April 9, 2018, set for the purpose of terminating his employment, at which GM allowed Plaintiff time to try and obtain documentation from his physician to substantiate his failure to return in January.

---

[36]The record shows that GM treated employees who violated Document 8 the same as Plaintiff, discharging forty-six employees under its progressive discipline provisions from 2015 through 2018. Plaintiff can point to no other UAW employee who violated the mandatory attendance policy without receiving discipline.

Welling and/or Plaintiff then requested a Key 2 Review of GM's discharge decision, which further delayed the termination.

These facts distinguish this case from <u>Ryther</u>, in which the employer provided no reason for the seven-month delay between terminating the plaintiff sportscaster and its receipt of market research results that rated him as "underperforming," which it cited as the reason for the termination.  108 F.3d at 835, 841.  In <u>Ryther</u>, the long delay "reasonably suggests the defendants did not want to provide [plaintiff] an opportunity to address his weaknesses."  <u>Id.</u> at 841.  Here, Plaintiff offers no reason why the time gap between his January 16, 2018, absence and his June 2018 termination tends to show that GM's stated reason for his termination is pretext.  Nor does Plaintiff establish issues to raise doubt as to GM's explanation of the reasons for the gap, some of which are due to Plaintiff's own actions.  Plaintiff merely contends that the time gap itself is per se evidence of pretext.  The Court cannot agree.  There is no evidence GM delayed in terminating Plaintiff to hide a retaliatory motive.  The fact that GM did not terminate Plaintiff's employment immediately after he failed to report to work on January 16, 2018, does not demonstrate pretext on this record.

Plaintiff also argues that although he was not terminated until June 28, 2018, he was told of GM's desire to terminate him on April 9, 2018, the very same day he told GM representative Al Renaud that he had filed an EEOC charge against GM.  The fact that Plaintiff told a GM Labor Representative about his EEOC Charge on the same day of a pre-scheduled disciplinary meeting, and then was terminated seventy days later, also does not raise a genuine issue of material fact as to pretext.  Further, Plaintiff knew GM was planning to fire him at least a month before he told Renaud about the EEOC Charge, and he knew the April 9, 2018, disciplinary meeting was scheduled before he spoke to Renaud.

The Eighth Circuit "has often expressed an inclination to discount temporal proximity due to the perceived risk that employees who anticipate discipline or adverse actions might preemptively engage in protected conduct to complicate or forestall such discipline or to set the stage for later retaliation claims." Donathan v. Oakley Grain, Inc., 861 F.3d 735, 742 (8th Cir. 2017) (Title VII case) (citing Wilson v. Ark. Dept. of Human Servs., 850 F.3d 368, 376 (8th Cir. 2017) (Loken, J., concurring in part and dissenting in part) (interpreting the Nassar standard "as instructing lower courts to stop letting contrived retaliation claims hijack or delay legitimate employer performance decisions")). "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Wierman, 638 F.3d at 1001. "This gives an explanation for the temporal proximity other than a retaliatory motive of the employer." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002). See also Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988) ("Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct[.]").

Finally, Plaintiff's assertion that GM's failure to accommodate him is evidence of retaliation fails for the same reason that his failure to accommodate claim failed:  GM accommodated Plaintiff by providing him ten months of paid leave and unpaid NJAWR leave when the paid leave was exhausted.  It then offered him positions through the ADAPT program that it believed met Plaintiff's work restrictions and, as those restrictions changed, continued to offer him positions that it believed met the modified restrictions.

In short, there is no basis on which a reasonable jury could conclude that GM used the mandatory attendance policy contained in Document 8 pretextually to terminate Plaintiff in retaliation for his protected activity.  Plaintiff's unexcused absence was a legitimate, non-

discriminatory reason for terminating his employment.  GM is entitled to summary judgment on Plaintiff's ADA retaliation claim.

### 2. MHRA retaliation claim

Under the MHRA, it is an unlawful discriminatory practice "to retaliate or discriminate in any manner" against an employee "because such person has opposed any practice prohibited by [the MHRA]" or "has filed a complaint pursuant to this chapter . . . ."  § 213.070(2), Mo. Rev. Stat. (2017).  To make a submissible case of retaliation, Plaintiff is required to demonstrate: (1) he complained of discrimination; (2) GM took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action.  See McCrainey v. Kansas City Mo. Sch. Dist., 337 S.W.3d 746, 753 (Mo. Ct. App. 2011).  Further, "Although § 213.070 proscribes retaliation 'in any manner,' the 'manner' in which an employer retaliates must nevertheless have some adverse impact on the plaintiff before it becomes actionable."  Kader v. Board of Regents of Harris-Stowe State Univ., 565 S.W.3d 182, 189-90 (Mo. 2019) (en banc).

Plaintiff must satisfy the causation standard by demonstrating that his EEOC Charge was a "motivating factor" to GM's termination of his employment.  See § 213.010(2) (2017); Bram, 564 S.W.3d at 795; Hill v. Ford Motor Co., 277 S.W.3d 659, 665 (Mo. 2009) (en banc) (recognizing a "causal relationship" exists when retaliation was a "contributing factor" to the adverse action, under the then-existing standard).  A motivating factor means the adverse employment "decision or action was taken 'because of' the person's protected status."  Bram, 564 S.W.3d at 795.

GM argues it is entitled to summary judgment on Plaintiff's MHRA retaliation claim because he did not engage in protected activity, and because Plaintiff does not establish a causal connection between his EEOC Charge and his termination.

a. *Protected Activity*

GM argues that Plaintiff never complained of disability discrimination internally, and that requesting an accommodation is not protected activity under the MHRA giving rise to a retaliation claim. To the extent Plaintiff's MHRA retaliation claim is based on his requests for accommodation, GM is entitled to summary judgment because Plaintiff did not engage in protected activity under the MHRA. See Li Lin, 594 S.W.3d at 244 ("a mere request for an accommodation does not fall within the plain language of either the opposition or participation clause of section 213.070.1(2)[.])" Plaintiff's filing of an EEOC Charge in October 2017 is protected activity under the MHRA, however.

b. *Causal Connection*

GM asserts that the eight-month period between the time Plaintiff filed his EEOC Charge and his termination precludes a finding that any alleged adverse actions relate to his engaging in statutory protected activity. "In order to survive summary judgment on a [MHRA] retaliation claim, . . . a plaintiff generally must present '*more than a temporal connection* between protected activity and an adverse employment action.'" Denn v. CSL Plasma, Inc., 816 F.3d 1027, 1036 (8th Cir. 2016) (quoting Williams v. Trans State Airlines, Inc., 218 S.W.3d 854, 869 (Mo. Ct. App. 2009), overruled in part on other grounds by Wilson v. City of Kansas City, 598 S.W.3d 888 (Mo. 2020) (en banc)). In Denn, a seven-week gap in time between the MHRA plaintiff's filing of a charge of discrimination and his termination "weaken[ed] the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." Id. at 1036-37; see also Medley, 173 S.W.3d at 325 (holding that a one-month period between protected activity and adverse action was insufficient to establish a causal connection in the absence of other evidence).

Plaintiff's retaliation claim cannot survive summary judgment because he has failed to provide any evidence that his EEOC Charge was a motivating factor to the termination of his

employment.  The eight-month gap in time between the filing of his charge and his termination is so great that without additional evidence linking Plaintiff's EEOC Charge to GM's decision to discharge him, any temporal connection between these events is insufficient to raise a genuine issue of material fact.  See Williams, 281 S.W.3d at 869.

As discussed above, Plaintiff has failed to undermine GM's lawful explanation for why it terminated his employment: his unexcused absence on January 16, 2018, that required termination under the mandatory attendance policy in Document 8.  Because "filing a complaint does not clothe [a plaintiff] with immunity for past and present inadequacies," Plaintiff's failure to comply with GM's attendance policy "overwhelms any temporal relationship between his discrimination complaint and subsequent firing."  Denn, 816 F.3d at 1037.

Plaintiff asserts he raises a fact issue as to causation because he told GM's Labor Representative about his filing of the EEOC Charge shortly before his scheduled April 9, 2018, disciplinary hearing.  As previously stated, the record indicates Plaintiff knew he was likely to be terminated a month before the disciplinary hearing because of his January 16, 2018, absence, and his attendance problems and discipline therefor preceded even Plaintiff's back injury in June 2016.  Under these circumstances, Plaintiff's statement to GM's Labor Representative about his EEOC Charge fails to give rise to a fact issue regarding whether the protected activity was a factor motivating his termination.

Plaintiff has failed to point to any evidence showing that his discrimination complaint was a "motivating factor" to any adverse action taken by GM.  Accordingly, no genuine issue of material fact remains as to whether any "causal relationship" exists between these two events.  See id.  GM is entitled to summary judgment on Plaintiff's MHRA retaliation claim in Count IV.

C.  Plaintiff's Workers Compensation Discrimination Claim

Count V of the complaint is a claim for retaliation as a result of Plaintiff's exercise of his right to file a claim under the Missouri Workers' Compensation statute, § 287.780, Mo. Rev. Stat. (2017).  Retaliation pursuant to the Missouri Workers' Compensation statute "is a statutory exception to the at-will employment doctrine." Templemire v. W & M Welding, Inc., 433 S.W.3d 371, 376-77 (Mo. 2014) (en banc).  To establish a claim under the statute, a plaintiff must prove: (1) he was employed by the defendant before the injury; (2) he exercised a right under the Missouri Workers' Compensation statute; (3) the defendant discriminated against or discharged the plaintiff; and (4) the plaintiff's exercise of rights under the statute was a motivating factor in his termination. Mo. Rev. Stat. § 287.780 (2017); Templemire, 433 S.W.3d at 384.

The parties agree that the "motivating factor" standard is appropriate on Plaintiff's workers' compensation retaliation claim.  For purposes of the statute, the term "'motivating factor' shall mean that the employee's exercise of his or her rights under this chapter actually played a role in the discharge or discrimination and had a determinative influence on the discharge or discrimination." § 287.780.

GM moves for summary judgment on the basis that Plaintiff cannot establish the fourth element of the claim, causation.  GM asserts that the record shows it terminated Plaintiff pursuant to Document 8 of the National CBA, and the termination was wholly unrelated to Plaintiff's filing of his workers' compensation claims or his exercise of any right under the statute, as demonstrated by the significant time gap between Plaintiff's filing of the claims and his discharge.  Plaintiff continued to work for GM for more than two years after he filed both of his workers' compensation claims.  GM establishes that it received more than 3,200 workers' compensation claims from 2015 to 2018, that a majority of those employees who filed claims remain employed with it, and Plaintiff

has not pointed to any comparators whose workers' compensation claims were processed or handled differently than his.

Plaintiff responds that while workers' compensation claims on average are resolved within 15.7 months, GM chose to litigate Plaintiff's claim for over three years.  Plaintiff argues without citation to any evidence of record that if GM had resolved his claim in a timelier manner, he "could have had better placement opportunities and also would have had the option to participate in leave *with* pay, and would not have been forced into taking leave without pay."  (ECF No. 106 at 19.) Plaintiff also claims that after he filed his workers' compensation claims, GM began to treat him with hostility, for example, by making it more and more difficult for Plaintiff to submit his working restrictions so he could be placed in an appropriate position.  In support, Plaintiff cites paragraphs 36 and 37 of his Declaration (ECF No. 109).

Plaintiff's assertion that he was treated with increasing hostility after he filed his workers' compensation claim is not factually supported by the cited paragraphs of Plaintiff's Declaration, and therefore the Court does not discuss it further.[37]

Plaintiff's assertion that GM retaliated against him by contesting his workers' compensation claim and precluding him from being eligible for additional paid leave, as opposed to unpaid NJAWR leave, does not state a claim for workers' compensation retaliation, much less establish the existence of a genuine issue of material fact.  The Missouri Supreme Court and the Eighth Circuit have rejected similar claims of workers' compensation discrimination or retaliation

---

[37]See Pl.'s Declaration (ECF No. 109):
"36.  On October 16, 2017, I returned to work after being placed on a NJAWR leave.
37.  My personal doctor prepared restrictions for me but did not check the line next to the restrictions."

as precluded by the Missouri Workers' Compensation Law's ("MWCL") exclusivity provision, § 287.120.2, Mo. Rev. Stat.[38]

Closely on point with this case is <u>Lambrich v. Kay</u>, 507 S.W.3d 66 (Mo. Ct. App. 2016), in which the plaintiff asserted a workers' compensation retaliation claim after his employer placed him on indefinite sick leave ("ISL") without pay because of conflicting medical opinions as to his physical condition.   <u>Id.</u> at 78.   Similar to Plaintiff's NJAWR status in this case, ISL was an administrative status assigned to employees who are unable to work and that protects an employee's position and seniority in the event the employee returns to work.   <u>Id.</u> at 69 n.3.   The trial court held that the plaintiff's retaliation allegations concerning unpaid leave were barred as a matter of law by the MWCL's exclusivity provision, and the Missouri Court of Appeals affirmed. <u>Id.</u> at 78-80.   In addition, the trial court held on the merits that placing the plaintiff on unpaid leave was neither discrimination nor a discharge under the third element of the workers' compensation retaliation prima facie case.   The Missouri Court of Appeals affirmed.   <u>Id.</u> at 80.

The plaintiff in <u>Lambrich</u> also alleged workers' compensation discrimination where his employer "require[ed] Plaintiff to perform specific tasks after being advised those tasks would cause Plaintiff further injury or aggravate his existing injuries" and "require[ed] Plaintiff to return to work after doctors had advised Defendants he had not been cleared to return to his regular job duties."   <u>Id.</u> at 77.   The trial court dismissed these claims as barred by the MWCL's exclusivity provision and the court of appeals affirmed.   <u>Id.</u>   This is fatal to Plaintiff's comparable claims.

Similarly, in <u>Felts v. Ford Motor Co.</u>, 916 S.W.2d 798 (Mo. Ct. App. 1995), <u>rev'd in part on other grounds by</u> <u>McCracken v. Wal-Mart Stores East, LP</u>, 298 S.W.3d 473 (Mo. 2009) (en

---

[38]Section 287.120.2, Mo. Rev. Stat., states: "The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee, his wife . . . at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter."

banc), the plaintiff alleged that as acts of discrimination and retaliation, his employer "placed him upon disability instead of continuing to provide Workers' Compensation benefits and gave him a job he was medically unable to perform." Id. at 802.  The Missouri Court of Appeals held the claims were properly dismissed because "[b]oth of the alleged wrongs committed by Ford against Felts are subjects within the exclusive jurisdiction of the [MCWL]." Id.

The plaintiff in Felts also alleged that Ford discriminated against him through the administration of his workers' compensation claim and the denial of workers' compensation benefits, but the court of appeals held these claims were also barred by the MWCL's exclusivity provision. Felts, 916 S.W.2d at 802-03.  This holding precludes Plaintiff's retaliation claim to the extent it is based on GM contesting and allegedly causing delay in resolving his claim.

In sum, Plaintiff's workers' compensation retaliation claim is based on allegations that GM placed Plaintiff on NJAWR leave, did not accept his physician's work restrictions, assigned him to jobs that caused him further injury, and contested and delayed his workers' compensation claims.  The claim must fail because each allegation is barred by the MCWL's exclusivity provision.  See Lambrich, 506 S.W.3d at 78-80; Felts, 916 S.W.2d at 802-03.

Moreover, GM would be entitled to summary judgment on the merits of Plaintiff's workers' compensation retaliation claim even if the exclusivity bar did not apply.  As discussed previously, GM has established that it terminated Plaintiff's employment pursuant to Document 8. "Causation does not exist for purposes of a workers' compensation retaliation claim if the basis for the employee's discharge is valid and nonpretextual." Stephenson v. Raskas Dairy, Inc., 26 S.W.3d 209, 212-13 (Mo. Ct. App. 2000) (cited case omitted).  Plaintiff does not establish the existence of a genuine issue of material fact as to the causation element of his retaliation claim because he does not present evidence to show that GM's nondiscriminatory reason for his termination is pretextual and that retaliation had a motivating influence on its decision to discharge

him.  See § 287.780.  The fact that Plaintiff continued to work for GM for two years after filing his claims, during which time GM provided him with ten months of paid leave, NJAWR leave, and multiple job placements in an attempt to accommodate his work restrictions, weakens any inference of retaliation to the point of nonexistence.

As a result, GM's motion for summary judgment will be granted on Plaintiff's workers' compensation retaliation claim in Count V.

D.  Plaintiff's Race Discrimination Claims

In Counts VI and VII, Plaintiff asserts claims for race discrimination in violation of Title VII and the MHRA, respectively.  Plaintiff's race discrimination claims are based entirely on actions by GM's Wentzville Plant Medical Director, Dr. Anil Gupta.  Plaintiff alleges that Dr. Gupta harassed him regarding his work restrictions and imposed more strict and unnecessary requirements on Plaintiff because of his race; attempted to interfere with Plaintiff's employment because of his race; and was hostile with Plaintiff, made fun of him, cut him off, and talked to Plaintiff in a condescending manner because of his race.  (ECF No. 31, ¶¶ 106-108 (Title VII); ¶¶ 115-117 (MHRA).)

Plaintiff has the initial burden of establishing a prima facie case of race discrimination, which requires him to show that (1) he was a member of a protected class, (2) he met GM's legitimate employment expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination based on race.  Grant v. City of Blytheville, Ark., 841 F.3d 767, 773 (8th Cir. 2016).  While the "burden of establishing a prima facie case . . . is not onerous," Plaintiff "must satisfy every element of his prima facie case, carrying at all times the 'ultimate burden of proof and persuasion' to establish that the employer discriminated against him on an impermissible basis."  Grant, 841F.3d at 773 (quoting Torgerson, 643 F.3d at 1046-47).

Under the <u>McDonnell Douglas</u> burden-shifting framework, "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." <u>Texas Dept. of Cmty. Affairs</u>, 450 U.S. at 254; <u>McDonnell Douglas</u>, 411 U.S. at 802-03.   If the plaintiff states a prima facie case for discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-08 (1993).

Similarly, MHRA § 213.055 prohibits employers from engaging in discriminatory employment practices, including wrongful termination.  The MHRA defines "discrimination" to include "any unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to employment, disability, or familial status as it relates to housing." § 213.010(c)(5), Mo. Rev. Stat.  As to plaintiff's MHRA race discrimination claim, the Court will "primarily apply Missouri law but may also apply federal employment discrimination law to the extent federal law is 'applicable and authoritative under the MHRA.'" <u>Heuton</u>, 930 F.3d at 1019 (quoted case omitted).  "In deciding a case under the MHRA, [Missouri] appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." <u>Li Lin</u>, 594 S.W.3d at 242.

GM moves for summary judgment arguing that Plaintiff's race discrimination claims fail because he admits Dr. Gupta was not involved in any adverse employment actions.  GM states that Plaintiff admits Dr. Gupta did not make any decisions related to Plaintiff's discipline, approval of benefits including leaves of absence, his job placement, or his termination.  GM also asserts that the record is devoid of evidence that race was a motivating factor in its decisions related to Plaintiff, as it presents undisputed evidence that half of the employees discharged at the Wentzville Plant based on absences more than twenty-four months old were white and half were Black, representative of the Plant's workforce.

Plaintiff responds that Dr. Gupta had a significant role in Plaintiff's job placement and restrictions as well as the power to cover Plaintiff from absences due to ongoing medical restrictions, so there is "no doubt" he had the ability to deprive Plaintiff of his employment opportunities or otherwise adversely affect his status as a GM employee. Plaintiff asserts that Dr. Gupta had a role in adverse employment action against Plaintiff and his termination by refusing to accept Plaintiff's medical restrictions, imposing unnecessary and burdensome requirements on Plaintiff to continue with work restrictions, and asking Plaintiff's personal physician to agree to reduce Plaintiff's restrictions so Plaintiff would be eligible for work on the assembly line. Plaintiff further asserts that Dr. Gupta made racially derogatory comments to Plaintiff including the implication that he was lazy and did not want to work, which is directly linked to Plaintiff's failure to be placed in a job with reasonable accommodations and his termination. (Pl. Dep. 527:8; 528:4-6.)

Here, assuming Plaintiff has established the first three elements of his prima facie case, he fails to establish that a genuine issue of material fact remains as to whether the circumstances give rise to an inference of discrimination based on race, or that race was a motivating factor to the termination of his employment. Plaintiff's allegations concerning Dr. Gupta do not raise a genuine issue of material fact as to this part of his case.

It is undisputed Plaintiff had reached Step 5 of the six steps of the Document 8 discipline process before his first appointment with Dr. Gupta in 2017, and that Dr. Gupta played no role in any discipline under Document 8 and did not participate in the decision to terminate Plaintiff's employment. Dr. Gupta and all of the witnesses with knowledge of the disciplinary process confirm Dr. Gupta's absence from the process. Plaintiff's unsupported belief that Dr. Gupta had a "say so" in the discipline process does not raise a genuine issue of material fact to the contrary, or as to whether Plaintiff's race was a factor in his termination.

Plaintiff broadly asserts that Dr. Gupta could "cover" absences, but this is an overgeneralization that is both inaccurate and immaterial.  The evidence is that Dr. Gupta's authority to cover absences applies only in limited situations, and Plaintiff does not show evidence that Dr. Gupta had the authority to cover his absence that is at issue in this case, the one starting on January 16, 2018, or that any purported failure to exercise that authority by Dr. Gupta was motivated by racial discrimination.  Plaintiff admits that both GM Labor Representative Rowena Rutledge and UAW Committeeman Chris Welling advised him to get a note from his own doctor covering his January 2018 through March 2018 absences (particularly January 16, 2018), which Plaintiff failed to do.  The evidence shows that Plaintiff failed to follow the proper procedure for having his January 16, 2018, and subsequent absences covered, which left him subject to discipline under Document 8.  The records shows that GM Plant Medical, under Dr. Gupta's leadership, had excused Plaintiff's absences several times when he followed the appropriate procedure.

Plaintiff has no evidence that Dr. Gupta intentionally discriminated against him on the basis of race.  Plaintiff's allegations that Dr. Gupta refused to accept Plaintiff's medical restrictions, imposed unnecessary and burdensome requirements on Plaintiff to continue with work restrictions, and asked Plaintiff's personal physician to agree to reduce Plaintiff's restrictions so Plaintiff would be eligible for work on the assembly line are, on their face, unrelated to Plaintiff's race and do not justify an inference of racial animus.

Plaintiff admits that Dr. Gupta never used any racial slurs or other overtly racial language but was rude and interrupted Plaintiff.  Plaintiff contends racial animus can be inferred from exchanges where Dr. Gupta said he felt like Plaintiff wanted to stay home, and didn't really care if Plaintiff wanted to stay home or not.  Plaintiff testified Dr. Gupta's statements *implied* he was lazy, which Plaintiff *interpreted* as racist.  Dr. Gupta's comments are facially race-neutral and Plaintiff's subjective interpretation of them does not warrant an inference of racial animus on Dr.

Gupta's part.  "Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker."  Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006) (white supervisors' comments that Black plaintiff "didn't know [her] place" or how to be "Midwest nice" were facially race-neutral and did not show racial animus) (citing Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003) (noting that statements that plaintiff was not "humble enough" and was "too prideful" were facially race-neutral and were not direct evidence of discrimination)).  See also Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006) (affirming judgment for employer where coworkers referred to plaintiff as "lazy" and "not up to standard" because the terms were "wholly unrelated to [plaintiff's] race or national origin or had [only] a tenuous connection to them").

The record shows Dr. Gupta often could be brusque, rude, and had a poor "bedside manner" in his dealings with Plaintiff and other GM employees.  Anti-discrimination laws do not establish codes of civility in the workplace, however.  "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."  Watt v. Brennan, 2015 WL 5735226, at *15 (E.D. Mo. Sept. 29, 2015) (quoting Shaver v. Independent Stave Co., 350 F.3d 716, 721 (8th Cir. 2003)).  Further, as stated above, none of Dr. Gupta's actions or comments related to the decisional process.

Because Plaintiff does not establish a genuine issue of material fact as to whether the circumstances give rise to an inference of discrimination based on race, or whether his race was a motivating factor in GM's decision to terminate his employment, GM is entitled to summary judgment on Plaintiff's Title VII and MHRA race discrimination claims.

**Conclusion**

Plaintiff has made an extraordinary effort in this case to create factual disputes with respect to each of his causes of action, even as to seemingly extraneous issues.  "Even if some

factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party." Ball, 870 F.3d at 727 (citing Anderson, 477 U.S. at 252).  That is the case here.  As to each cause of action, the evidence of record as a whole could not lead a rational trier of fact to find for Plaintiff. For the reasons discussed above, the Court will grant Defendant GM's motion for summary judgment in all respects.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant General Motors, LLC's Motion for Summary Judgment is **GRANTED**.  [ECF No. 95]

An appropriate Judgment will accompany this Memorandum and Order.


_Ronnie L. White_
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**


Dated this  25th  day of June, 2020.